921 F.2d 659
 In re AKRON-CLEVELAND AUTO RENTAL, INC., Debtor.
Charles GARRETT d/b/a Garretts, Plaintiff-Appellee,
v.
AKRON-CLEVELAND AUTO RENTAL, INC., Defendant,
Freed Ford Sales, Inc., Defendant-Appellant,
Family Pontiac, Inc., Defendant.
 No. 90-3282.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 15, 1990.
Decided Dec. 18, 1990.
 
 John R. Kassinger, James R. King (argued), James E. Becker, Nickolas P. Andreeff, Amer, Cunningham & Brennan, Akron, Ohio, for plaintiff-appellee.
 Mark E. Staib (argued), Daniel A. DeMarco, Alan S. Kopit, Hahn, Loeser & Parks, Cleveland, Ohio, James R. McIlvaine, Palecek, McIlvaine & Paul Co., Wadsworth, Ohio, for Freed Ford Sales, Inc.
 Before KENNEDY and MILBURN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 This case concerns the ownership of 12 motor vehicles. Although the suit involved several defendants below, the parties on appeal are plaintiff-appellee Charles Garrett, d/b/a Garretts ("Garretts"), a Pennsylvania used car dealer, and defendant-appellant Freed Ford Sales, Inc. ("Freed"), an Ohio new and used car dealer. Freed appeals from the District Court's judgment in favor of Garretts adopting the proposed findings of fact and conclusions of law of the Bankruptcy Court in this action to determine title to the vehicles under Ohio law. For reasons that follow, we REVERSE and REMAND.
 
 I.
 
 2
 The following facts are undisputed. In or about November 1986, Freed began selling new cars to Akron-Cleveland Auto Rental, Inc., d/b/a Thrifty Car Rental ("ACAR"), a licensed Ohio motor vehicle leasing and used vehicle dealer. After a course of dealing spanning 19 months, Freed and ACAR engaged in the transactions at issue in this appeal. During May and June 1988, Freed delivered to ACAR as a fleet rental buyer the 12 vehicles involved here. The Bankruptcy Court described the sales process as follows:
 
 
 3
 19. ACAR, through its principal Jay Robson (Robson), would place an order for new vehicles pursuant to its fleet rental discount with ... Freed ... who would then prepare a buyer's order reflecting a sale of each vehicle to ACAR. Personnel at Freed ... would prepare the paperwork for the temporary license tags and temporary license tags in the name of ACAR were placed on each vehicle. At or about the time of sale, ACAR, through Robson, would tender a check for the purchase price for each vehicle to Freed ... which check was to be held until a subsequent time. Each of the vehicles was delivered to the possession and custody of ACAR with the consent of Freed....
 
 
 4
 20. At some time subsequent to the tendering of the check, Robson would advise Freed ... that the checks could be cashed. Said time period varied from one to three weeks and sometimes as long as six weeks.
 
 
 5
 21. From 1986 to April, 1988, Freed delivered to ACAR the Manufacturer's Certificate of Origin [also referred to as manufacturer's statements of origin or] (MSO) along with the cars prior to being advised that ACAR's checks were to be cashed which was usually about a week later. In March, 1988, Freed was holding ACAR's checks for as long as three weeks after ACAR purchased and took possession of the cars. Therefore, in April, 1988 through July 18, 1988 Freed did not deliver MSOs to ACAR with the cars. The MSOs were delivered upon Robson's advice that the checks could be cashed.
 
 
 6
 Garretts began buying used cars from ACAR in April 1987, and purchased a total of 332 cars from ACAR through July 11, 1988. In June 1988 and continuing through July 1988, Garretts purchased from ACAR the 12 cars at issue here, making payment for and taking delivery of the vehicles. In accordance with usual practice, Garretts was not provided with titles to the vehicles at the time of delivery but was advised that they were forthcoming. It was not unusual for Garretts to wait three weeks for a title from ACAR. Garretts returned one of the twelve cars to ACAR in late July for repair of a defective windshield. Freed obtained possession of that car from the lot of ACAR on July 27, 1988 and subsequently resold it.
 
 
 7
 On July 29, 1988, ACAR ceased operations when an involuntary Chapter 7 petition was filed by several creditors. Freed had apparently not yet been paid for the 12 vehicles and still maintained possession of the MSOs for the vehicles that ACAR had resold to Garretts. Freed demanded that Garretts turn over the remaining 11 cars at issue but Garretts refused. Instead, Garretts commenced these proceedings on August 31, 1988, in the Bankruptcy Court seeking a declaratory judgment and equitable relief. Garretts alleged, inter alia, that title to the vehicles had passed to it by operation of Ohio law and in addition that it was an innocent purchaser for value and a buyer in the ordinary course of business to whom title was vested. Freed countered that since it never transferred the MSOs, under Ohio law Garretts has no recognizable interest in title to the vehicles.
 
 
 8
 The Bankruptcy Trustee relinquished any claim to an interest in the subject vehicles. Freed therefore asserted that the Bankruptcy Court lacked subject matter jurisdiction and that this was not a core proceeding under 28 U.S.C. Sec. 157(b). The Bankruptcy Court concluded that the complaint pertained to prepetition activities and raised state law issues between nondebtor parties, and therefore that this was a non-core proceeding. However, the court also found that it had jurisdiction under 28 U.S.C. Sec. 1334(b), as a matter related to a case under Title 11 of the United States Code. Because Freed did not consent to that court's jurisdiction to enter a final order, the Bankruptcy Court decided to hear the matter pursuant to 28 U.S.C. Sec. 157(c)(1), and submit proposed findings of fact and conclusions of law to the United States District Court.
 
 
 9
 On April 11, 1989, following a trial, the Bankruptcy Court entered its Proposed Findings of Fact and Conclusions of Law. Therein the court held, among other things, that Freed had "sold" the vehicles in question to ACAR; that Freed had violated Ohio Rev.Code Ann. Sec. 4505.03 (Anderson 1990) by selling and delivering the cars to ACAR without providing title documents;[1] that Garretts had purchased and paid for the vehicles from ACAR; and that ACAR had violated several provisions of Ohio law, including section 4505.03, in selling the vehicles to Garretts without obtaining or providing a certificate of title. Consequently, the court concluded that as between Freed and Garretts, Freed should bear the burden of the loss since its "conduct created the opportunity for ACAR to perpetrate the wrong or cause the loss" to Garretts. In re Easy Living, Inc., 407 F.2d 142, 145 (6th Cir.1969) and Hardware Mutual Casualty Co. v. Gall, 15 Ohio St.2d 261, 267, 240 N.E.2d 502 (1968). Although Garretts also argued that it was entitled to the vehicles under the Ohio version of the Uniform Commercial Code, Ohio Rev.Code ch. 1302, the Bankruptcy Court did not base its decision on that argument.
 
 
 10
 The Bankruptcy Court recommended that judgment be rendered in favor of Garretts and that an order be issued directing that Ohio certificates of title be issued in Charles Garrett's name for all of the vehicles at issue. The court also suggested that Garretts was entitled to damages against Freed for the value of the vehicle that Freed had repossessed and resold. Finally, the court recommended that Freed become an unsecured creditor of ACAR in the bankruptcy case to the extent of any monies owed from the sale of the vehicles by Freed to ACAR.
 
 
 11
 On March 1, 1990, the District Court adopted the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law after reviewing and considering de novo the record together with the Bankruptcy Court's findings and conclusions and Freed's objections thereto. Freed appeals from the District Court's judgment.
 
 II.
 
 12
 The question on appeal is whether Freed, as holder of the MSOs on the vehicles, is entitled to keep them or whether Garretts is entitled to the vehicles. In deciding the question presented, we must follow the law of Ohio as declared by its legislature and supreme court. Where the Ohio Supreme Court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue. Bailey v. V & O Press Co., 770 F.2d 601, 604 (6th Cir.1985). In addition, we will normally treat decisions of state courts of appeals on issues of state law as authoritative absent a strong showing that the state's highest court would decide the issue differently. Laundree v. AMCA Int'l, 908 F.2d 43, 45-46 (6th Cir.1990).
 
 
 13
 Freed vociferously contends that this case must be resolved by application of Ohio Rev.Code Ann. Sec. 4505.04, claiming that statute is dispositive of the issue before us. In pertinent part section 4505.04 provides:
 
 
 14
 (B) [N]o court shall recognize the right, title, claim, or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:
 
 
 15
 (1) By a certificate of title, [or] a manufacturer's or importer's certificate ... issued in accordance with sections 4505.01 to 4505.19 of the Revised Code.
 
 
 16
 Freed argues that since it never relinquished the MSOs, section 4505.04 precludes a court from recognizing title in Garretts.
 
 
 17
 Section 4505.04 is not as inflexible as Freed suggests. Although the Ohio Supreme Court has not addressed a situation like this one, that court has explicitly recognized that section 4505.04 is not to be construed literally and that "narrowly drawn case-law exceptions" involving "equitable ownership" do exist, including where fraud has occurred. State v. Shimits, 10 Ohio St.3d 83, 85, 461 N.E.2d 1278 (1984). Therefore, we must look to the cases creating and applying these exceptions to determine whether the Bankruptcy and District Courts below properly applied Ohio law.
 
 III.
 A.
 
 18
 The District Court relied on two cases to support its judgment awarding the vehicles to Garretts: Easy Living, 407 F.2d at 142 (applying Ohio law), and Gall, 15 Ohio St.2d at 261, 240 N.E.2d 502. The court did not discuss those cases but simply cited them in support of the conclusion that "the parties, i.e., Freed ... whose conduct created the opportunity for ACAR to perpetrate the wrong or cause the loss should bear the burden," and therefore that Garretts was to be awarded title to the vehicles.
 
 
 19
 Easy Living occurred in the context of a bankruptcy case and involved a dispute over the ownership of mobile homes which had been sold by the debtor-dealer. The dealer did not have certificates of title for the mobile homes at the time of sale, as required by Ohio law, but procured them about one and one half years later and prior to bankruptcy. The certificates were issued in the dealer's name but the dealer never transferred them to the purchasers. Upon the bankruptcy of the dealer, the Trustee seized possession of the two mobile homes, claiming them as assets of the bankrupt's estate. He applied to the court for an order determining that he was the sole owner of the mobile homes, arguing that since the bankrupt dealer was named as the owner in the certificates of title, the estate became the sole owner because of the clear language of Ohio Rev.Code Ann. Sec. 4505.04. The district judge did not uphold that contention, but instead held that the two buyers were innocent purchasers for value and ordered the Trustee to cause certificates of title to be issued in their names. We agreed. First, we found that a trustee in bankruptcy takes title to the bankrupt's property subject to all liens, claims and equities existing thereon. 407 F.2d at 144. Second, we found that the dealer had violated Ohio Rev.Code Ann. Sec. 4505.06 by not obtaining certificates of title in the names of the purchasers.[2] Third, we found that the dealer also failed to perform an express contractual obligation to provide title certificates in the purchaser's names. 407 F.2d at 145. Finally, we noted that the Ohio Supreme Court has recognized exceptions to the seemingly absolute language of section 4505.04, and we quoted from that court's decision in Gall, 15 Ohio St.2d at 267, 240 N.E.2d 502, for the proposition that " '[w]hen one of two innocent persons must suffer from the fraud of a third, the one who made it possible for the fraud to be perpetrated must bear the loss.' " Easy Living, 407 F.2d at 145 (emphasis added). We concluded that "[s]ince equity regards as done that which in good conscience should have been done, the District Court was correct in ordering the Trustee to comply with the Ohio statute by causing certificates of title to be issued to the innocent purchasers who were defrauded by the bankrupt." Id. (emphasis added).
 
 
 20
 That case is not controlling here. The instant case, unlike Easy Living, does not involve a dispute between a bankrupt's trustee and an innocent purchaser from the bankrupt so there is no application of the rule, central to the reasoning of that case, that a trustee takes title to a bankrupt's property subject to claims and equities thereon. In addition, unlike Easy Living, here there was no privity of contract between Freed and Garretts, so there is no contractual obligation to enforce, at least as between them. Further, and most importantly, here there has been no determination that Garretts was an innocent purchaser.
 
 
 21
 The second case relied on by the District Court was Gall, 15 Ohio St.2d at 261, 240 N.E.2d 502. That case concerned who was to be awarded ownership of a stolen vehicle which had been taken from Michigan to Ohio, for which a fraudulent but apparently valid Ohio title certificate was issued, and was sold to an innocent purchaser. After reviewing its prior decisions the court awarded the car to the original owner, holding that "[a] thief cannot convey valid title to a stolen motor vehicle to a bona fide purchaser for value without notice ... absent any question of estoppel arising from an act of the owner." Id. at 268, 240 N.E.2d 502. The court's admonition, cited by the District Court below, that "[w]hen one of two innocent persons must suffer from the fraud of a third, the one who made it possible for the fraud to be perpetrated must bear the loss," id. at 267, 240 N.E.2d 502 (emphasis added), was dicta occurring in the discussion of a prior case and its relevance to the Gall holding is unclear. In any event, Gall does not provide the rule of decision for this case since that case dealt only with the issue of stolen vehicles and did not discuss section 4505.04.
 
 B.
 
 22
 The clear factual differences between the instant case and both Easy Living and Gall make those cases persuasive only by analogy. However, we believe that neither of those cases relied on by the District Court can support its judgment. Simply put, we do not believe that the Gall equitable principle of allocating loss between two innocent parties is applicable to this case, at least not without significant modification.
 
 
 23
 The Gall principle is limited by its terms to disputes involving two "innocent" parties. This is in keeping with the general equitable principle that one seeking equity must come before the court with clean hands. Both Easy Living and Gall clearly involved parties who were truly innocent, only one of which could be awarded the vehicles at issue. The District Court altered the Gall principle by reading the innocence requirement out of the rule altogether. In the absence of some evidence that the Ohio Supreme Court would so drastically alter the equitable principle of Gall, we apply its principle here. Although the District Court concluded that Freed had not been an innocent participant with respect to the vehicle transactions at issue, the court made no findings with respect to Garretts. Our reading of the record convinces us that a finding is necessary.
 
 
 24
 Garretts was not in the business of buying new cars, dealing only with used vehicles and specializing in low-mileage, late model cars. Garretts purchased many of its cars from daily rental companies like ACAR. Charles Garrett testified that it was customary to wait two or three weeks to receive certificates of title after paying for and taking delivery of used vehicles purchased from rental agencies like ACAR. Garrett testified that although he knew that ACAR was "turning [cars] quickly," he had no knowledge that ACAR wouldn't have a right to sell any of the vehicles he purchased and he apparently didn't ask any questions. Ignorance does not necessarily cloak Garretts with innocence here.
 
 
 25
 Garrett testified that he personally saw every one of the cars at issue before he purchased them and in fact selected them himself from ACAR's lot. The record also shows that several of the cars had less than 100 miles on their odometers when he inspected and purchased them and that others had between 100 and 200 miles. Four or five of the vehicles still had the factory window stickers on them, naming Freed Ford as the purchasing new car dealer and still had Freed Ford license plate brackets attached. Garrett admitted that it was "unusual" to find such vehicles marketed as used vehicles by rental agencies. It is also telling that Garretts paid more for most of the 12 vehicles than the highest market value suggested by the National Auto Research Black Book, Used Car Market Guide, which Garrett acknowledged as an authority for used vehicle market prices. The record reflects that within a week or two of purchasing these "used" cars from ACAR, Garretts had resold five of the vehicles at issue for profits of $500 to $1,100, substantially higher than the $200 profit that Garrett testified was normal for used cars.[3]
 
 
 26
 The evidence convinces us that it had to be obvious to Garretts, a used car dealer who had been buying and selling cars for 32 years and who dealt extensively with used rental car agency vehicles, that at least five of the vehicles at issue here were new cars and had not been put into rental operation. In concluding that Freed had "created the opportunity for ACAR to perpetrate the wrong" with respect to these 12 cars, the District Court explained itself thus: "In this case, had Freed ... required ACAR to pay upon purchase and possession by ACAR of the cars, the MSOs would have been tendered to ACAR as well. Then any wrongdoings by ACAR in selling the cars ... would have been of little consequence to Freed ... and there would have been no question as to title ownership." This is true as far as it goes but it is just as easy to conclude that Garretts created and assumed the risk of loss by purchasing vehicles which were obviously new and were being sold by a daily rental company in violation of state law without insisting on an inspection of title documentation. Ohio Rev.Code Ann. Sec. 4517.03(E) provides in relevant part that "[n]o motor vehicle leasing dealer or motor vehicle renting dealer ... shall sell a motor vehicle within ninety days after a certificate of title to the motor vehicle is issued to the dealer." ACAR clearly violated this provision with respect to these 12 vehicles sold to Garretts. It is difficult to believe that Charles Garrett, who had been dealing in used vehicles in Ohio for 32 years and purchased most of his vehicles from leasing/renting dealers, was unaware of the strictures of section 4517.03(E).
 
 
 27
 Also telling is the fact that Garretts argued below that it was a buyer in the ordinary course of business pursuant to Ohio Rev.Code Ann. Sec. 1301.01(I). Although it is not conclusive, the failure of the courts below to make any finding as to whether Garretts acted in "good faith" with respect to its purchase of these vehicles indicates at least that those courts may have had doubts about Garretts' actions.
 
 C.
 
 28
 As to Freed, the District Court made two findings, one of law and the other of fact, that led to the conclusion that Freed was somehow at fault and should bear the burden of any loss. First, the court held that Freed "sold to ACAR the vehicles in question in contravention of Ohio Rev.C. Sec. 4505.03." Section 4505.03, captioned "Certificate of title," provides in part that:
 
 
 29
 No person, except as provided in section 4505.05 ... shall sell or otherwise dispose of a motor vehicle without delivering to the purchaser or transferee thereof a certificate of title ... to show title in the purchaser. (Emphasis added.)The District Court apparently interpreted section 4505.03 to require delivery of the title document contemporaneously with the delivery of vehicles. Even if that interpretation were accurate, it is not obvious that section 4505.03 would even apply to this case which involves manufacturer's certificates, not certificates of title. That the two are recognized as distinct documents is evidenced by the existence of section 4505.05, which applies only to manufacturer's or importer's certificates.
 
 
 30
 Section 4505.05, captioned "Manufacturer's or importer's certificate," provides in part that:
 
 
 31
 No ... dealer, or other person shall sell or otherwise dispose of a new motor vehicle to a dealer to be used by the dealer for purposes of display and resale, without delivering to the dealer a manufacturer's or importer's certificate ... to show title in the purchaser thereof.
 
 
 32
 It is not clear that section 4505.05 would even be applicable here since it is limited to instances where the buying dealer is purchasing vehicles "for purposes of display and resale," i.e., sales to new car dealers, which ACAR was not.
 
 
 33
 The relevant factual finding by the District Court was the statement that "[i]t was obvious from the testimony that Freed and Family [Pontiac, another defendant dealer] especially Family, were aware that ACAR was marketing these cars almost immediately upon receipt in contravention of Ohio Rev.C. Sec. 4517.03(E)." (emphasis added).[4] Garretts is able to point us only to the following single statement by Deforest Freed, principal of Freed, to support the District Court's finding:
 
 
 34
 [Counsel]: Was [ACAR] reselling those vehicles?
 
 
 35
 [Freed]: Not to my knowledge other than I'm sure after they became used and had a quantity of miles on them and had tenure of service he was surely selling the cars.
 
 
 36
 This statement does not support a holding that Freed had knowledge that ACAR was reselling cars almost immediately. Moreover, Deforest Freed testified under oath at several points during his examination that he had no knowledge or suspicion that ACAR was reselling cars upon receipt in violation of Ohio law, and this evidence was uncontroverted. Neither the Bankruptcy Court nor the District Court found Deforest Freed's testimony incredible.[5] "A finding is clearly erroneous when, although there is evidence to support it, the entire evidence leaves the reviewing court with a definite and firm conviction that the lower court made a mistake." United States v. Ransbottom, 914 F.2d 743, 747 (6th Cir.) (citation omitted), cert. denied, --- U.S. ----, 111 S.Ct. 439, 112 L.Ed.2d 422 (1990). After a careful review of the record, we are left with the definite and firm conviction that the District Court made a mistake in its conclusion that Freed, as opposed to Family Pontiac, had knowledge that ACAR was reselling new cars in violation of state law.
 
 
 37
 Because we find that the District Court's findings of "fault" on the part of Freed are at least partially in error, and that a finding as to whether Garretts was an "innocent" party for purposes of applying the Gall principle is necessary, we reverse the District Court's judgment in favor of Garretts. Because the courts below incorrectly held for Garretts on the Gall principle they did not address Garretts' additional arguments based on the Ohio Sales Act and we decline to pass on those arguments here.IV.
 
 
 38
 For the foregoing reasons, we REVERSE the District Court's judgment in favor of Garretts. This case is, therefore, REMANDED to the District Court with instructions to REMAND to the Bankruptcy Court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Section 4505.03, captioned "Certificate of title," provides in part that "[n]o person ... shall sell or otherwise dispose of a motor vehicle without delivering to the purchaser or transferee thereof a certificate of title...."
 
 
 [2]
 Section 4505.06(A) provides in part that "[i]n the case of the sale of a motor vehicle by a dealer to a general purchaser or user, the certificate of title shall be obtained in the name of the purchaser by the dealer upon application signed by the purchaser...."
 
 
 [3]
 The record contains complete information on the following four vehicles:
 Market Purchase Sales
Serial Odometer* Value# Price Price Profit
202918 113 $7,450 $7,400 $7,900 $500
216276 123 $13,500 $13,400 $14,000 $600
221578 120 $7,340 $7,400 $8,500 $1,100
268215 209 $10,285 $10,900 $11,400 $500
 
 
 *
 This includes approximately 70 miles that Garretts had driven the vehicle
 from ACAR to Garretts' lot.
 # This is the highest price listed, for "extra clean" condition, in the
 National Auto Research Black Book, Used Car Market Guide.
 
 
 [4]
 This finding was actually contained within the Bankruptcy Court's conclusions of law rather than its findings of fact. Apparently its location was based upon that court's view that this finding was necessary to its legal conclusion that Freed's "conduct created the opportunity for ACAR" to sell the vehicles without title documents
 
 
 [5]
 Freed's knowledge that ACAR was having cash flow trouble, inferred from the fact that Freed began withholding the delivery of MSOs until receiving payment from ACAR, does not make it "obvious" that Freed was aware of ACAR's illegal conduct. There was no evidence that Freed had anything but an arms-length relationship with ACAR and Freed, unlike Family Pontiac, was not engaged in buying back cars which it had sold to ACAR