Cheryl RUFFIN–STEINBACK, individually and in her capacity as Personal Representative of the Estate of Davis E. Ruffin, p/k/a David Ruffin, Nedra Ruffin, Kimberly Bogan, David Ruffin, Jr., Earline Ruffin, Josephine Miles, Johnnie Mae Mathews and Rose Franklin, individuals, Plaintiffs,

v.

Suzanne dePASSE, dePasse Entertainment, Otis Williams ("Temptations"), Shelly Burger, National Broadcasting Company, Inc., David Picker and Hallmark Entertainment, individuals and corporations, jointly and severally, Defendants.

Nos. 99–70513, 99–70514, 99–70515, 99–71088.

United States District Court, E.D. Michigan, Southern Division.

Feb. 3, 2000.

Gregory J. Reed, Bertram L. Marks, Gregory J. Reed & Associates, PC, Detroit, MI, for plaintiffs.

Herschel P. Fink, Cynthia G. Thomas, Honigman Miller Schwartz & Cohn, Detroit, MI, for defendant dePasse.

Gregory M. Kopacz, Douglas F. Fryer, Marvin D. Wilder, Dykema Gossett PLLC, Bloomfield Hills, for defendants Hallmark, NBC and David Picker.

## OPINION AND ORDER

FEIKENS, District Judge.

## I. INTRODUCTION

The production and airing of a mini-series docudrama[1] depicting the story of the "legendary Motown act" the "Temptations" set the stage for this case. Plaintiffs are the estate of one of the former members of the group, Davis "David" Ruffin (Ruffin), Ruffin's heirs and his mother, and three other persons depicted in the mini-series. They filed complaints against several defendants, alleging state law tort claims for violation of the right of publicity, unjust enrichment, negligence, conspiracy, invasion of privacy, defamation and intentional infliction of emotional distress. Defendants, in response, filed motions to dismiss the complaints for failure to state claims under Michigan law.

## II. BACKGROUND

In November 1998, defendant National Broadcasting Company (NBC) aired a four-hour, two-night mini-series depicting the story of the Temptations as told by Otis Williams, a founding member of the group. Defendants Suzanne de Passe, de Passe Entertainment, Otis Williams, Shelly Burger, David Picker and Hallmark Entertainment were involved in the production of the mini-series.[2]

The mini-series relates the story of the Temptations from their beginning as a singing group until the present time. It is based upon a novel written by Otis Williams, and was told, essentially, from his perspective. It details portions of the lives of the original members of the Temptations, Eddie Kendricks, Paul Williams, Melvin Franklin, Otis Williams and Elbridge Bryant. Significantly, for our purposes, the mini-series also contains details of the life of the late David Ruffin, the lead singer for the Temptations from 1964 to 1968. It also depicts many of the people who were involved in either family or business relationships with the Temptations: Melvin Franklin's mother, Rose Franklin; Otis Williams' first wife, Josephine Miles; and the first agent of the Temptations (when they were known as Otis Williams and the Distants), Johnnie Mae Mathews. None of these persons, David Ruffin (through his estate), Rose Franklin, Josephine Miles or Johnnie Mae Mathews was compensated for the use of their life-stories as they related to the Temptations. Allegedly, none of these people consented to the use of their likenesses—through actor portrayals—in the mini-series.

In January 1999, plaintiff Cheryl Ruffin–Steinback (Ruffin–Steinback), individually and as the personal representative of the estate of David Ruffin, filed suit against the defendants in the Wayne County Circuit Court in Detroit.[3] She alleged, on behalf of the estate, state law tort claims for violation of the right of publicity, unjust enrichment, negligence, conspiracy and invasion of privacy. Joining with her in the complaint were David Ruffin's re-

---

1. The term "docudrama" connotes a type of film or novelization in which real-life events are embellished with fictional dramatic events. *See* J. Thomas McCarthy, *Rights of Publicity and Privacy*, § 8.9[A] fn. 2 (1988).

2. Though Otis Williams, Shelly Burger and Suzanne de Passe are named as defendants in this case, they have never been properly served.

3. In an earlier, related case before me, plaintiff Cheryl Ruffin–Steinback had sought a preliminary injunction enjoining defendants from producing and airing the mini-series. That request was denied. *Ruffin–Steinback v. de Passe,* 17 F.Supp.2d 699 (E.D.Mich.1998).

maining heirs, including Nedra Ruffin, Kimberly Bogan and David Ruffin, Jr. They, along with Ruffin–Steinback, alleged individual claims of intentional infliction of emotional distress. Also joining in the complaint was the late Earline Ruffin, David Ruffin's mother. The complaint raised, on behalf of Earline Ruffin, separate counts of defamation, false light invasion of privacy, defamation by implication and intentional infliction of emotional distress.

Three other related complaints were filed, one each by Rose Franklin, Johnnie Mae Mathews and Josephine Miles. Each complaint alleged violations of the right of publicity, unjust enrichment, negligence and conspiracy, and all of the complaints but that of Johnnie Mae Mathews alleged intentional infliction of emotional distress. Johnnie Mae Mathews' complaint also alleged defamation and false light invasion of privacy, and Josephine Miles' complaint alleged defamation and invasion of privacy based on the public disclosure of private embarrassing facts.

Each of the complaints requested that defendants be enjoined from further dissemination of the mini-series or sale of video-cassettes containing the movie and that defendants provide an accounting of all financial amounts resulting from the airing of the movie and sale of the video-tapes.

The cases were removed to this court by defendants based on diversity jurisdiction and were consolidated pursuant to Federal Rule of Civil Procedure (FRCP) 42(a). I denied plaintiffs' motions for remand to state court.

Defendants then filed motions to dismiss the complaints, contending that none of the approximately thirty counts in the four complaints could be maintained, either as a matter of Michigan law, or on the facts of this case. Several hearings have been held in order to clarify the parties' arguments and expand the record. For the reasons that follow, I conclude that only Johnnie Mae Mathews' counts of defamation and false light invasion of privacy can properly be maintained.

## III. STANDARDS FOR SUMMARY JUDGMENT AND DISMISSAL

Defendants' motions were initially filed as motions to dismiss pursuant to FRCP 12(b)(6). In ruling on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, the factual allegations in the complaint are taken as true and construed in a light most favorable to the plaintiffs. *See Pinney Dock and Transport Co. v. Penn Central Corp.*, 196 F.3d 617, 619 (6th Cir.1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987)). "Denial of the motion is proper 'unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir.1989)).

During the course of arguments, the parties have submitted documentary evidence, primarily in the form of affidavits, in support of their positions and I have, where appropriate and necessary, considered this evidentiary material. As to some of the counts of the complaint, then, defendants' motion to dismiss is more properly considered a motion for summary judgment pursuant to FRCP 56. *See Fugarino v. Hartford Life and Accident Ins. Co.*, 969 F.2d 178, 182 (6th Cir.1992). Courts properly grant summary judgment when the moving party establishes through pleadings, depositions, answers to interrogatories, admissions, and affidavits that "there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Mauro v. Borgess Medical Center*, 137 F.3d 398, 401 (6th Cir.1998), quoting FRCP 56(c). Under Rule 56(c), a defendant bears an initial burden of demonstrating that an essential element of the non-moving party's case is lacking. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmoving party must then show that there is in fact a genuine issue for trial, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and must identify specific facts, supported by evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding a motion for summary judgment, the court must view the factual evidence in a light most favorable to the nonmoving party. *Mount Elliott Cemetery Ass'n. v. City of Troy*, 171 F.3d 398, 402–3 (6th Cir.1999) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## IV. DISCUSSION

This case contains a myriad of claims, some of which are common to all plaintiffs and some of which are unique to only one or two plaintiffs. Some counts, though common to more than one plaintiff—such as the defamation counts—depend on differing facts in each plaintiff's case. With this in mind, I address the counts of plaintiffs' complaints and defendants' arguments for dismissal or summary judgment in the following manner:

(A) Misappropriation claims—all plaintiffs.

(B) Unjust enrichment, conspiracy and negligence claims—all plaintiffs.

(C) Defamation, defamation by implication, and false light invasion of privacy claims:

 (1) Josephine Miles.

 (2) Earline Ruffin.

 (3) Johnnie Mae Mathews.

(D) Invasion of privacy based on public disclosure of private embarrassing facts—Josephine Miles only.

(E) Intentional infliction of emotional distress claims—all plaintiffs.

## A. MISAPPROPRIATION OF LIKENESS—RIGHTS OF PRIVACY AND PUBLICITY

■ The principal issue in this case is plaintiffs' claim that defendants unlawfully misappropriated their life-stories, names, and likenesses in producing and airing the Temptations miniseries. Simply put, plaintiffs seek compensation for the use of their names and life-events in the miniseries.

■ The Michigan Supreme Court[4] has recognized a tort-claim for the invasion of a right to privacy that includes misappropriation of a person's name or likeness:

The common-law right of privacy is said to protect against four types of invasion of privacy.

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

2. Public disclosure of embarrassing private facts about the plaintiff.

3. Publicity which places the plaintiff in a false light in the public eye.

4. *Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.*

*Tobin v. Civil Service Employees of State of Michigan*, 416 Mich. 661, 672, 331 N.W.2d 184 (1982) (quoting *Beaumont v. Brown*, 401 Mich. 80, 95 fn. 10, 257 N.W.2d 522 (1977) (further citations omitted) (emphasis added)). This fourth category of invasion of privacy—misappropriation of a person's name or likeness—has become

4. With two caveats, the parties agree that Michigan law applies to the plaintiffs' claims.

The first caveat arises from the defamation claim of the late Earline Ruffin. As will be discussed below, Mississippi law applies to her defamation claim. The second caveat involves plaintiffs' contention that California law applies to the interpretation of a contract involving Otis Williams and "Motown"—a non-defendant entity. As footnote 5 makes clear, that contract is not relevant to plaintiffs' claims. In all events, it is not relevant to the substantive analysis of their tort claims.

known as the "right of publicity." *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir.1983). This "right of publicity" differs from the first three types of the right to privacy; rather than the protection of a person's right "to be left alone," this right protects an individual's pecuniary interest in the commercial exploitation of his or her identity. *Id.*

Michigan courts have not had occasion to address the "right of publicity" other than to note that it is among the types of "invasion of privacy" rights recognized under Michigan law. There are, however, two reported federal cases addressing the "right to publicity" under Michigan law. *Carson, supra,* and *Janda v. Riley–Meggs Industries, Inc.,* 764 F.Supp. 1223 (E.D.Mich.1991). In *Carson,* plaintiff Johnny Carson, former host and star of "The Tonight Show," filed a complaint against Here's Johnny Portable Toilets, Inc. for trademark infringement, unfair competition, and invasion of the right of publicity. *Carson,* 698 F.2d at 833. Relevant to the present case, Carson claimed that the defendant's use of the phrase "Here's Johnny,"—a phrase readily identified with Carson—was tantamount to commercial exploitation of his celebrity identity in order to promote defendant's portable toilets. *Id.* at 835. The United States Court of Appeals for the Sixth Circuit (Sixth Circuit) agreed. *Id.* at 837. In *Janda,* a nationally recognized orthopedic surgeon brought suit against the manufacturer of "breakaway" softball and baseball bases, alleging unfair competition, deceptive trade practices and invasion of privacy, including misappropriation of his name or likeness. *Janda,* 764 F.Supp. at 1226. The manufacturer had included, in its advertisement of its product, references to studies conducted by the plaintiff on "breakaway" bases, implying that the plaintiff specifically endorsed the defendant's products. *Id.* The plaintiff had not, however, either endorsed or tested the defendant's products. The district court held that the defendant's actions constituted misappropriation of the plaintiff's name or likeness. *Id.* at 1230–31.

These two cases represent, for present purposes, fairly straightforward application of the right of publicity tort. In each case, a defendant sought to endorse or promote a product by associating the plaintiff with the product without the plaintiff's permission; liability resulted. This case is different. Defendants' alleged misappropriation of the name or likenesses of David Ruffin, Josephine Miles, Rose Franklin and Johnnie Mae Mathews did not arise from an attempt to promote or endorse a product, *per se,* but from defendants' depiction of the life-stories of these people as part of the story of the Temptations as told by Otis Williams. The question in this case, therefore, is whether depicting one's life-story without his or her permission, particularly where some of the events are fictionalized, constitutes a violation of the right of publicity under Michigan law. Because the Michigan Supreme Court has not addressed this issue, my task is to discern from all available sources how that court would respond if confronted with the issue. *See Prestige Casualty Co. v. Michigan Mutual Ins. Co.,* 99 F.3d 1340, 1348 (6th Cir.1996); *In re Akron–Cleveland Auto Rental, Inc.,* 921 F.2d 659, 662 (6th Cir.1990) (citing *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir. 1985)).

The Restatement (Third) of Unfair Competition § 46 (1995) gives this description of the right of publicity:

> One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for the purposes of trade is subject to liability for the relief appropriate under the rules stated in §§ 48 and 49.

Section 47 provides, however:

> The name, likeness, and other indicia of a person's identity are used "for the purposes of trade" under the rule stated in § 46 if they are used in advertising the user's goods or services, or are

placed on merchandise marketed by the user, or are used in connection with services rendered by the user. *However-er, use "for the purposes of trade" does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses.*

Restatement (Third) of Unfair Competition § 47 (1995) (emphasis added). Comment c explains:

The use of a celebrity's name or photograph as part of an article published in a fan magazine or in a feature story broadcast on an entertainment program, for example, will not infringe the celebrity's right of publicity. Similarly, the right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography. Use of another's identity in a novel, play, or motion picture is also not ordinarily an infringement. The fact that the publisher or other user seeks or is successful in obtaining a commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable.

Restatement (Third) of Unfair Competition § 47 comment c (1995).

Caselaw from jurisdictions other than Michigan is consistent with the Restatement's treatment of this issue. In *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) (applying Texas law) the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) considered a case in which an ex-husband filed a complaint alleging, among other things, misappropriation of his name or likeness by his ex-wife and a movie studio. *Id.* at 436. The plaintiff's ex-wife had written a book relating events in the plaintiff's life as an undercover police officer, and had sold the "movie rights" to the defendant movie studio. *Id.* The Fifth Circuit denied the plaintiff's claim that the depiction of events in his life as a police officer, some of which had been fictionalized, could constitute a violation of his right of publicity.

The term "likeness" does not include general incidents from a person's life, especially when fictionalized. The narrative of an individual's life, standing alone, lacks the value of a name or likeness that the misappropriation tort protects.

*Matthews,* 15 F.3d at 438. *See also Whitehead v. Paramount Pictures Corp.,* 53 F.Supp.2d 38, 53 (D.D.C.1999) (quoting *Matthews* and holding that the misappropriation prong of common-law invasion of privacy did not extend to appropriating the story of another person's life).

In *Seale v. Gramercy Pictures,* 949 F.Supp. 331 (E.D.Pa.1996) (applying Pennsylvania law), former Black Panther Bobby Seale filed suit against the producers of a film depicting a fictionalized account of his life-story. *Id.* at 334. Citing the Restatement (Third) of Unfair Competition § 47 (1995), the court held that the depiction of the plaintiff's life-story did not constitute a violation of his right of publicity. *Id.* at 337.

These authorities, though not controlling, directly address the issue presented in this case; they uniformly suggest that the right of publicity does not extend to prohibit depictions of a person's life-story. In response, plaintiffs present two arguments.

■ First, they contend that the right of publicity should extend to defendants' actions in this case because, they allege, the depiction of the plaintiffs in this case was partially fictionalized and untrue. The scope of the right of publicity does not depend, however, on the fictional or non-fictional character of the work. *See Rogers v. Grimaldi,* 695 F.Supp. 112, 121 (S.D.N.Y.1988); Restatement (Third) of Unfair Competition § 47 (1995). Furthermore, to the extent that courts have been reluctant to extend the right of publicity to depictions of life-stories based on First Amendment considerations, those considerations are no less relevant whether the work in question is fictional, non-fictional or a combination of the two. *See Wozen-*

*craft,* 15 F.3d at 440; *Seale,* 949 F.Supp. at 337; *Rogers,* 695 F.Supp. at 121–123. As comment c to § 47 of the Restatement (Third) of Unfair Competition explains, where the plaintiff's theory of liability stems from the alleged falsity of the information disseminated, the action is properly considered as an action for defamation or false light invasion of privacy, not as an action for violation of the right of publicity.

Second, in an attempt to re-cast their right to publicity claim in a light more analogous to *Carson* and *Janda,* plaintiffs argue that their rights of publicity were violated not only by depiction of their life-stories, but also by defendants' efforts to promote the mini-series and sales of the video-cassette of the mini-series—particularly by their use of scenes from the mini-series in which David Ruffin is depicted. This argument must also be rejected. As *Rogers, Seale* and the Restatement provisions quoted above make clear, use of plaintiffs' names or likenesses in promoting a story about plaintiffs does not implicate the right of publicity. *Rogers,* 695 F.Supp. at 123; *Seale,* 949 F.Supp. at 337 (noting that use of the plaintiff's picture on the cover of the book was "clearly related" to the content of the book).

▆ Plaintiffs have failed to cite caselaw from any jurisdiction supporting their claim that the right of publicity may be extended to preclude depiction of one's life-story. Considering the authorities discussed above, and in the absence of any contrary authority, I conclude that Michi-

gan courts would not extend the right of publicity tort to these facts.[5]

## B. UNJUST ENRICHMENT, CONSPIRACY AND NEGLIGENCE

It is apparent from the averments contained in these counts of each of the four complaints that these counts are duplicative or derivative of the right of publicity count. For the reasons stated in Section IV. A., defendants' motions to dismiss are granted as to these counts.

## C. "FALSE LIGHT" CLAIMS—DEFAMATION, DEFAMATION BY IMPLICATION AND FALSE LIGHT INVASION OF PRIVACY

Each complaint except Rose Franklin's alleges some form of a "false light" claim—a claim for damages based on false or defamatory material in the mini-series. In order to properly address each of these claims, however, separate attention must be given to the counts of each plaintiff's case.

### 1. Josephine Miles

Josephine Miles (Miles) is the former wife of Otis Williams. She and Otis met in high school, and she became pregnant with Otis' child before they were married. During the time they were married, and after the divorce, Otis allegedly spent much more time "on the road" touring with the Temptations than at home with his child. The mini-series depicted much of this information—indeed, one subplot of

5. Before moving on, I pause to note one additional argument advanced by plaintiffs in opposition to defendants' motions as to the misappropriation claims. Plaintiffs have included in the record at least two partial copies of a "Multi-media Agreement" contemplating that the parties to the contract (none of whom were plaintiffs) would obtain "satisfactory releases" of "all persons portrayed" in the mini-series, and would obtain "rights or clearances" from "former members" "[t]o the extent that Motown in its good faith business judgment determines that any rights or clearances of any kind must be obtained". *See* Plaintiff Ruffin–Steinback's Response, Ex. 2. This document, plaintiffs contend, serves

as a basis for finding that their rights of publicity have been violated. Because the document was allegedly entered into in California, plaintiffs also contend that California law should apply to its interpretation.

In response, I first note that plaintiffs have not pleaded a count based on the breach of a contractual obligation. Nor could they. Assuming, as plaintiffs argue, that the agreement obligated Otis Williams to obtain releases from the plaintiffs (a fact that is not evident from the partial copies in the record before me), the text of the document before me does not also confer rights, otherwise non-existent, upon plaintiffs.

the mini-series included Otis Williams' struggle to balance his career and his family life. According to Miles' complaint, however, the mini-series portrayed Otis Williams as having more contact with Miles and their son than he in fact had.

 Miles' complaint alleges a defamation count based upon this claimed inaccuracy. Her allegation has two components. First, Miles contends that the mini-series depicted Otis Williams as a better father and husband than he in fact was—giving Miles less credit for the raising of their son than she should have received. As defendants correctly argue, this component of Miles' defamation claim can be quickly dismissed; any inaccuracies that may have existed concerning Otis Williams' behavior as a father are not "false or defamatory statement[s] *concerning*" Miles.[6] *Rouch v. Enquirer & News,* 440 Mich. 238, 251, 487 N.W.2d 205 (1992) (emphasis added).[7]

 Second, Miles claims that the mini-series, in portraying Otis Williams as having spent time with Miles and their son, depicted her as unchaste. Miles reasons that the allegedly inaccurate depiction of Otis Williams spending time with her and her son implies that their relationship was "ongoing," but that friends and family, who knew Miles, were aware that she was, in fact, involved with another man at the time of some of the events depicted in the mini-series. *See* Affidavit of Josephine Miles, filed June 18, 1999, ¶ 12.

 The principal difficulty with this argument is that the alleged defamatory nature of the statements derives not from the statements themselves, but from multiple inferences based on outside knowledge. Having reviewed the mini-series with particular attention to this argument, however, I can find nothing in the content of the mini-series that arguably or reasonably supports the inferences that Miles attempts to draw. Under Michigan law, the court may determine whether, as a matter of law, a statement is actually capable of defamatory meaning. *See Ireland v. Edwards,* 230 Mich.App. 607, 619, 584 N.W.2d 632 (1998). Where, as here, no such meaning is possible, summary judgment should be granted. *Id.*

## 2. Johnnie Mae Mathews

Johnnie Mae Mathews (Mathews) was the first manager or agent of the Temptations, when they were known as Otis Williams and the Distants. In the particular scene of the mini-series that forms the basis of Mathews' claims of defamation and false light invasion of privacy, Mathews is depicted driving up to the Temptations in a brand new Cadillac with the words "Otis Williams and the Distants" painted on the side. She produces a large roll of money and intimates that the money represents amounts earned by the Temptations through their performances. When the members of the group ask to be paid, however, disagreement surfaces, and the conversation, as well as the relationship between Mathews and the Distants/Temptations, is depicted as ending with Mathews placing all of the money in her bosom and driving away in the Cadillac. The implication of the scene is that

---

6. Miles, in a proposed amended complaint attached to a motion for leave to amend her complaint, alleges, in an apparent attempt to avoid this difficulty, that the mini-series "portray[ed] her as a woman that could not raise a child without a father." *See* Plaintiffs Ruffin-Steinback, Miles and Mathews' Amended Motion for Leave to Amend Complaints, filed June 24, 1999, Ex. A., Proposed Miles' Complaint, ¶ 55. I have reviewed the entire mini-series and find that there is no factual basis for this allegation.

7. *Rouch* recites the elements of defamation under Michigan law as:
 (1) a false and defamatory statement concerning plaintiff;
 (2) an unprivileged communication to a third party;
 (3) fault amounting to at least negligence on the part of the publisher; and
 (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
 *Rouch,* 440 Mich. at 251, 487 N.W.2d 205.

Mathews never returned the money or the car, and that both belonged to the Temptations.

Mathews contends that the incident involving the Cadillac did not occur as depicted and, as a result, alleges false light invasion of privacy and defamation. In her Second Amended Complaint, Mathews also alleges defamation by implication.

The sole basis for defendants' motion to dismiss this claim is a procedural argument. Defendants content that Mathews failed to plead the defamation claims with particularity as required by Michigan law. *See, e.g. MacGriff v. Van Antwerp,* 327 Mich. 200, 204–205, 41 N.W.2d 524 (1950); *Royal Palace Homes v. Channel 7 of Detroit,* 197 Mich.App. 48, 56–57, 495 N.W.2d 392 (1992). At a hearing held on October 4, 1999, both parties viewed the scene described above, and Mathews was directed to file an amended complaint setting forth the alleged defamatory content of that scene. On October 18, 1999, Mathews filed a Second Amended Complaint setting out the allegedly defamatory content of the scene and quoting verbatim from the scene. *See* Second Amended Complaint, ¶¶ 48, 49. This Second Amended Complaint renders defendants' procedural argument moot. Defendants having presented no other arguments in favor of summary judgment or dismissal, their motion to dismiss Mathews' defamation, defamation by implication and false light invasion of privacy claims is denied.

### 3. Earline Ruffin

Earline Ruffin, although she was not David Ruffin's biological mother, was the woman who raised David Ruffin. She was not depicted in the mini-series, but nonetheless raised counts of defamation, defamation by implication and false light invasion of privacy based on one line in the mini-series, spoken by the actor protraying

David Ruffin: "My moma owed some pimp some money. Instead of paying him she gave me to him." *See* Plaintiffs Ruffin–Steinback, Miles and Mathews' Amended Motion for Leave to Amend Complaints, filed June 24, 1999, Ex. A., Proposed Ruffin–Steinback Complaint, ¶ 65.

If the implication of this statement is untrue, the defamatory nature of the statement is obvious. The crux of the dispute as to these counts, however, focuses on whether the phrase "my moma" sufficiently identified Earline Ruffin so as to constitute a defamatory statement concerning her.

■ Subsequent events make it unnecessary to determine this issue. On August 15, 1999, Earline Ruffin died at the age of 98.[8] Under Mississippi law, where Earline Ruffin was domiciled, a cause of action for defamation does not survive the death of the plaintiff, *see Catchings v. Hartman,* 178 Miss. 672, 174 So. 553, 554 (1937), even where the case was filed prior to the death of the plaintiff. *Id.*[9]

■ In response, plaintiffs do not argue, or even cite, Mississippi law, but rather contend that Michigan law should be applied to Earline Ruffin's defamation claims. "It is well-established that federal courts sitting in diversity must apply the choice-of-law rules of the forum state." *Cole v. Mileti,* 133 F.3d 433, 437 (6th Cir. 1998), citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Charash v. Oberlin College,* 14 F.3d 291, 296 (6th Cir.1994). The Michigan Supreme Court recently described the analytical framework for Michigan choice-of-law rules in *Sutherland v. Kennington Truck Service, Ltd.,* 454 Mich. 274, 562 N.W.2d 466 (1997).

---

**8.** Strangely, defendants had earlier produced another death certificate for an Earline Ruffin of Meridian, Mississippi, showing a date of death of July 20, 1994. I will assume, for the purposes of this opinion, that the Earline Ruffin named in this case was the Earline Ruffin that died on August 15, 1999.

**9.** Though *Catchings* addressed only common-law defamation, I find no reason to predict that Mississippi would treat false light invasion of privacy differently with regard to the survivability of the claim.

[W]e will apply Michigan law unless a "rational reason" to do otherwise exists. In determining whether a rational reason to displace Michigan law exists, we undertake a two-step analysis. First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Sutherland,* 454 Mich. at 286, 562 N.W.2d 466, citing *Olmstead v. Anderson,* 428 Mich. 1, 24, 29–30, 400 N.W.2d 292 (1987).

In this case, Earline Ruffin was domiciled in Mississippi, and in the case of multistate publication of defamatory material, plaintiff's domicile will ordinarily be the state with the greatest interest in having its law applied. *See, e.g.,* Restatement (Second) of Conflict of Laws § 150 comment e (1971). On the other hand, plaintiffs note that several of the prospective heirs of Earline Ruffin live in Michigan, and they contend Michigan has an interest in affording those heirs a remedy for Earline Ruffin's defamation in Mississippi. Said differently, however, plaintiffs' argument is that Michigan has an interest in the injury to Earline Ruffin in Mississippi because of the possibility that Michigan residents will benefit from her recovery. Such an interest is too remote to outweigh Mississippi's traditional interest in having its law applied to defamation regarding its residents. Further, as *Catchings* notes, a defamation claim is personal to the person defamed—it does not exist for the benefit of possible heirs. *Catchings,* 174 So. at 553–54.

It is for these reasons that I conclude that Mississippi law applies, and Earline Ruffin's defamation, defamation by implication and false light counts must be dismissed.

## D. PUBLIC DISCLOSURE OF PRIVATE EMBARRASSING FACTS

Based on the same facts outlined in Section IV. C. 1. above, Miles also alleges a violation of her right to privacy based on the public disclosure of private embarrassing facts. Under Michigan law, a cause of action for public disclosure of embarrassing private facts requires

(1) the disclosure of information;

(2) that is highly offensive to a reasonable person; and

(3) that is of no legitimate concern to the public.

*Smith v. Calvary Christian Church,* 233 Mich.App. 96, 113–14, 592 N.W.2d 713 (1998) (footnote omitted) (citing *Doe v. Mills,* 212 Mich.App. 73, 80–1, 536 N.W.2d 824 (1995)). Ordinarily, the jury must determine whether a public disclosure involves embarrassing private facts. *Id.*

Miles contends that the miniseries' depiction of her high school relationship with Otis Williams, and particularly her premarital pregnancy, was private information, of no legitimate concern to the public, and highly offensive in its disclosure. Whatever the case as to the elements listed above, however, Miles' claim necessarily fails, because "there is no liability [for public disclosure of private embarrassing facts] when the defendant merely gives further publicity to information about the plaintiff that is already public." *Fry v. Ionia Sentinel–Standard,* 101 Mich.App. 725, 729, 300 N.W.2d 687 (1980). Otis Williams' book, upon which the miniseries was based, was published in 1989 and contained the information about which Miles now complains. Furthermore, neither birth records nor marriage records are private documents; it cannot seriously be contended that Miles' premarital pregnancy, while perhaps embarrassing, is a private fact.

## E. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, each plaintiff except Mathews alleges a count of intentional in-

fliction of emotional distress. To establish a prima facie case of intentional infliction of emotional distress in Michigan, a plaintiff must establish four elements:

(1) extreme and outrageous conduct;
(2) intent or recklessness;
(3) causation; and
(4) severe emotional distress.

*Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir.1998). The "outrageous conduct" requirement is satisfied only by conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985)). Whether alleged conduct constitutes extreme or outrageous conduct is initially a question to be decided by the court. *Doe v. Mills,* 212 Mich.App. 73, 92, 536 N.W.2d 824 (1995).

 Though plaintiffs' claims of intentional infliction of emotional distress vary slightly from plaintiff to plaintiff, the essential argument raised by plaintiffs is that defendants' actions in depicting their life-stories without their consent (or the life-stories of their relative, in the case of Ruffin's heirs) constitute extreme and outrageous conduct. This argument is quickly dismissed. These actions were not tortious in any sense, and certainly cannot be reasonably considered outrageous. *See, e.g., Andrews,* 160 F.3d at 309.

Plaintiffs also contend that the fictionalized nature of the mini-series resulted in numerous inaccuracies [10] and that these inaccuracies resulted in severe emotional distress to the plaintiffs. Assuming that each of the inaccuracies described in plaintiffs' complaints and submissions is inaccu-

rate in the manner described by plaintiffs, defendants' actions in producing and airing this fictionalized account of the story of the Temptations cannot be considered so extreme in degree as to go beyond all possible bounds of decency. Summary judgment is therefore properly granted as to these counts.

## V. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss or for summary judgment are GRANTED as to all claims except Johnnie Mae Mathews' defamation counts.

**IT IS SO ORDERED.**

---

**10.** For instance, Rose Franklin claims that the mini-series incorrectly depicted her son, Melvin, as dying in a wheel chair and as being despondent at the time of his death. Ruffin's heirs claim that the mini-series incorrectly depicted Ruffin as a "dead-beat dad," inaccurately depicted the circumstances surrounding Ruffin's death, and generally presented an "imbalanced" depiction of Ruffin's

life. They also claim that the mini-series inaccurately suggested that Earline Ruffin associated with a pimp. Miles claims that the mini-series incorrectly portrayed Otis Williams as a better father and husband than he in fact was. In addition, Miles claims that the mini-series' depiction of the news of the death of her son, while technically accurate, nonetheless caused her emotional distress.