RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0137P (6th Cir.)
File Name: 03a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ROSA PARKS,
    *Plaintiff-Appellant,*

v.                                   No. 99-2495

LAFACE RECORDS, et al.,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 99-60256—Barbara K. Hackett, District Judge.

Argued: May 4, 2001

Decided and Filed: May 12, 2003

Before: NORRIS and COLE, Circuit Judges;
HOLSCHUH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Johnnie L. Cochran, Jr., COCHRAN, SHERRY, GIVENS & SMITH, Los Angeles, California, for Appellant. Joseph M. Beck, KILPATRICK STOCKTON LLP, Atlanta,

_____

[*] The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

Georgia, for Appellees. **ON BRIEF:** Johnnie L. Cochran, Jr., COCHRAN, SHERRY, GIVENS & SMITH, Los Angeles, California, Gregory J. Reed, GREGORY J. REED & ASSOCIATES, Detroit, Michigan, for Appellant. Joseph M. Beck, Christopher J. Kellner, KILPATRICK STOCKTON LLP, Atlanta, Georgia, for Appellees.

_____

## OPINION

_____

JOHN D. HOLSCHUH, District Judge. This is a dispute over the name of a song. Rosa Parks is a civil rights icon who first gained prominence during the Montgomery, Alabama bus boycott in 1955. She brings suit against LaFace Records, a record producer, and OutKast, a "rap" (or "hip-hop") music duo, as well as several other named affiliates, for using her name as the title of their song, *Rosa Parks*. Parks contends that Defendants' use of her name constitutes false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and intrudes on her common law right of publicity under Michigan state law. Defendants argue that they are entitled to summary judgment because Parks has failed to show any violation of the Lanham Act or her right of publicity. Defendants further argue that, even if she has shown such a violation, their First Amendment freedom of artistic expression should be a defense as a matter of law to each of these claims. Parks also contends that Defendants' conduct renders them liable under Michigan law for defamation and tortious interference with a business relationship; Defendants have also denied liability with respect to these claims.

Parks brought this action in a Michigan state court. Defendants subsequently removed the case to the District Court for the Eastern District of Michigan. Following cross-motions for summary judgment, the district court denied Parks' motion for summary judgment and granted summary judgment for Defendants. Parks now appeals the grant of summary judgment for Defendants.

For the reasons hereafter set forth, we believe that, with respect to Rosa Parks' claims under the Lanham Act and under the common law right of publicity, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We therefore conclude that the district court erred in granting Defendants' motion for summary judgment on those claims. We conclude, however, that the district court properly granted summary judgment in favor of Defendants on Rosa Parks' state law claims of defamation and tortious interference with a business relationship.

## I. BACKGROUND

### A. Facts

Rosa Parks is an historical figure who first gained prominence as a symbol of the civil rights movement in the United States during the 1950's and 1960's. In 1955, while riding in the front of a segregated bus in Montgomery, Alabama, she refused to yield her seat to a white passenger and move to the back of the bus as blacks were required to do by the then-existing laws requiring segregation of the races. A 381-day bus boycott in Montgomery flowed from that one event, which eventually became a catalyst for organized boycotts, sit-ins, and demonstrations all across the South. Her single act of defiance has garnered her numerous public accolades and awards, and she has used that celebrity status to promote various civil and human rights causes as well as television programs and books inspired by her life story. She has also approved a collection of gospel recordings by various artists entitled *Verity Records Presents: A Tribute to Mrs. Rosa Parks* (the "*Tribute*" album)*,* released in 1995.

Defendants are OutKast, comprised of recording artists André "Dré" Benjamin and Antwan "Big Boi" Patton; their record producers, LaFace, founded by and named after

Antonio "L.A." Reid and Kenny "Babyface" Edmonds;[1] and LaFace's record distributors, Arista Records and BMG Entertainment (collectively "Defendants"). In September 1998, Defendants released the album *Aquemini*. The album's first single release was a song titled *Rosa Parks*, described as a "hit single" by a sticker on the album. The same sticker that contained the name *Rosa Parks* also contained a Parental Advisory warning of "explicit content." J.A. at 60. Because, as later discussed, the critical issue in this case is a determination of the artistic relevance of the title, *Rosa Parks*, to the content of the song, the lyrics obviously must be considered in their entirety. They are as follows:

(Hook)
Ah ha, hush that fuss
Everybody move to the back of the bus
Do you wanna bump and slump with us
We the type of people make the club get crunk

Verse 1: (Big Boi)
Many a day has passed, the night has gone by
But still I find the time to put that bump off in your eye
Total chaos, for these playas, thought we was absent
We takin another route to represent the Dungeon Family
Like Great Day, me and my nigga decide to take the back way
We stabbing every city then we headed to that bat cave
A-T-L, Georgia, what we do for ya
Bull doggin hoes like them Georgetown Hoyas
Boy you sounding silly, thank my Brougham aint sittin pretty
Doing doughnuts round you suckas like then circles around titties
Damn we the committee gone burn it down
But us gone bust you in the mouth with the chorus now

---

[1]Parks did not effect service of process of this lawsuit on Reid or Edmonds, and they are not defendants in their individual capacity, although they are listed as defendants in the caption on the district court's docket.

(Hook)

Verse 2: (André)
I met a gypsy and she hipped me to some life game
To stimulate then activate the left and right brain
Said baby boy you only funky as your last cut
You focus on the past your ass'll be a has what
Thats one to live by or either that one to die to
I try to just throw it at you determine your own adventure
Andre, got to her station here's my destination
She got off the bus, the conversation lingered in my head
for hours
Took a shower kinda sour cause my favorite group ain't
comin with it
But I'm witcha you cause you probably goin through it
anyway
But anyhow when in doubt went on out and bought it
Cause I thought it would be jammin but examine all the
flawsky-wawsky
Awfully, it's sad and it's costly, but that's all she wrote
And I hope I never have to float in that boat
Up shit creek it's weak is the last quote
That I want to hear when I'm goin down when all's said
and done
And we got a new joe in town
When the record player get to skippin and slowin down
All yawl can say is them niggas earned that crown but
until then . . .

(Hook)
(Harmonica Solo)
(Hook til fade)

J.A. at 521.

## B. Procedural History

Parks sued Defendants in the Wayne County Circuit Court of Michigan alleging, *inter alia*, that Defendants' unauthorized use of her name infringes on her right to

publicity, defames her character, and interferes with an ongoing business relationship. Defendants removed this case to the District Court for the Eastern District of Michigan. Parks thereafter filed an amended complaint that reiterated her state law claims and added a false advertising claim under § 43(a) of the Lanham Act.

The parties entered into a stipulation of the facts[2] ("Stipulated Facts") and filed cross-motions for summary judgment. Applying *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), the district court concluded that the First Amendment, as a matter of law, was a defense to Parks' Lanham Act and right of publicity claims. *See Parks v. LaFace Records*, 76 F. Supp. 2d 775, 780-84 (E.D. Mich. 1999). Specifically, the court found that (1) an "obvious relationship" between the content of the song and its title *Rosa Parks* renders the right of publicity inapplicable as a matter of law, *id*. at 780; (2) with respect to the Lanham Act, there was no explicit representation that the work was endorsed by Parks, *id*. at 783; (3) the prominent appearance of OutKast's name on their album cured any likelihood of consumer confusion between Plaintiff's and Defendants' albums as a matter of law, *id*. at 784; and (4) even if there were some likelihood of consumer confusion, such risk was outweighed by the First Amendment interests of the Defendants, *id*. at 783. Because, in the opinion of the district court, Parks had failed to raise any genuine issue of material fact to overcome Defendants' First Amendment defense or

---

[2]Parks alleged at oral argument that both parties did not subscribe to the Stipulated Facts. However, Parks did not raise any challenge to the Stipulated Facts in the district court. Indeed, she filed a cross motion for summary judgment and insisted that there was "no issue of fact that is being disputed here." J.A. at 545. "Stipulations voluntarily entered by the parties are binding, both on the district court and on [the appellate court]." *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1038 (6th Cir. 1991). Parks has given us no cause to question the voluntariness of the Stipulated Facts; therefore, we will not consider the challenge. *See Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir. 1993) (declining to address issues raised for the first time on appeal absent "exceptional circumstances").

otherwise support her claims under the Lanham Act and her right of publicity, the district court denied Parks' motion for summary judgment and granted summary judgment for Defendants. *Id.* at 788-89. The district court also granted summary judgment in favor of Defendants on Rosa Parks' claims of defamation and tortious interference with a business relationship. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *See Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir.2002). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate. "When parties file cross-motions for summary judgment, 'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001)(*citing* 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

### B. The Lanham Act

Section 43(a) of the Lanham Act creates a civil cause of action against any person who identifies his or her product in such a way as to likely cause confusion among consumers or to cause consumers to make a mistake or to deceive consumers as to association of the producer of the product with another person or regarding the origin of the product or the sponsorship or approval of the product by another person. The language of § 43(a) is broad. It provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Plaintiffs often invoke § 43(a) to protect intellectual property rights in "marks," or brand names, of ordinary merchandise, such as apparel, *see, e.g., A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 206 (3d Cir. 2000) (suit by manufacturer of "Miraclesuit" swimwear against manufacturer of "The Miracle Bra" swimwear), or of services, such as mortgage companies, *see Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 725 (7th Cir. 1998) (suit between mortgage service companies using the "Platinum" name).

However, the scope of § 43(a) extends beyond disputes between producers of commercial products and their competitors. It also permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others. *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) (celebrity suit against snack manufacturer for unauthorized use of his distinctive voice in a commercial); *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 624-25 (S.D.N.Y. 1985) (celebrity suit against a video retailer for use of a celebrity look-alike in its advertisements); *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 626 (6th Cir. 2000) (actor sued toy company for creating an action figure named after one of his movie characters); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996) (professional basketball player sued car manufacturer for using his birth name to sell cars). Celebrities have standing to sue under § 43(a) because they possess an economic interest in their identities akin to that of a traditional trademark holder. *See Waits*, 978 F.2d at 1110. *See also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:15 (4th ed. 2002)(discussing cases).

In order to prevail on a false advertising claim under § 43(a), a celebrity must show that use of his or her name is likely to cause confusion among consumers as to the "affiliation, connection, or association" between the celebrity and the defendant's goods or services or as to the celebrity's participation in the "origin, sponsorship, or approval" of the defendant's goods or services. *See* 15 U.S.C. § 1125(a)(1)(A); *Landham*, 227 F.3d at 626; *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 966 (10th Cir. 1996); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992). Consumer confusion occurs when "consumers . . . believe that the products or services offered by the parties are affiliated in some way," *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991), or "when consumers make an incorrect mental association between the involved

commercial products or their producers," *Cardtoons*, 95 F.3d at 966 (*quoting San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 564 (1987) (Brennan, J., dissenting)). A "likelihood" means a "probability" rather than a "possibility" of confusion. *See Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1189 (6th Cir. 1988) (finding a "clear likelihood of confusion" because it was "highly probable" that a purchaser would believe a car wax was affiliated with another manufacturer); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:3 (4th ed. 2002)(citing cases). *But cf. Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) (noting that a plaintiff need only show "a sufficient *potential* of confusion, not actual confusion").

Parks contends that Defendants have violated the Lanham Act because the *Rosa Parks* title misleads consumers into believing that the song is about her or that she is affiliated with the Defendants, or has sponsored or approved the *Rosa Parks* song and the *Aquemini* album. She argues that the risk of confusion is enhanced by the fact that her authorized *Tribute* album is in the marketplace alongside Defendants' album featuring the *Rosa Parks* single. As additional evidence for her claim, Parks points to Defendants' concession that they have used the *Rosa Parks* title to advertise and promote both the song and the *Aquemini* album. She also supplies twenty-one affidavits from consumers affirming that they either believed Defendants' song was about Parks or was connected to the *Tribute* album authorized by her.

Defendants respond that Parks' Lanham Act claim must fail for two reasons. First, they claim that Parks does not possess a trademark right in her name and Defendants have not made a trademark use of her name, as allegedly required for a cause of action under the Lanham Act. Second, they contend that even if use of the title posed some risk of consumer confusion, the risk is outweighed by Defendants' First Amendment right to free expression.

### 1. *Trademark Right In and Trademark Use of Parks' Name*

Citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 756 (6th Cir. 1998), Defendants contend that Parks' § 43(a) claim must fail because they have made no trademark use of her name. However, Defendants misconceive the legal basis of a Lanham Act claim. It is not necessary for them to make a "trademark" use of Rosa Parks' name in order for her to have a cause of action for false advertising under § 43(a) of the Lanham Act.

Rosa Parks clearly has a property interest in her name akin to that of a person holding a trademark. It is beyond question that Parks is a celebrity.[3] The parties have stipulated to her international fame and to her prior authorization of television programs and books. We have already established, *supra*, that courts routinely recognize a property right in celebrity identity akin to that of a trademark holder under § 43(a). *See, e.g.*, *Landham*, 227 F.3d at 626; *Waits*, 978 F.2d at 1110; *Allen*, 610 F. Supp. at 624-25. We find Parks' prior commercial activities and international recognition as a symbol of the civil rights movement endow her with a trademark interest in her name the same as if she were a famous actor or musician.

Therefore, even though Rosa Parks' name might not be eligible for registration as a trademark, and even though Defendants were not selling Rosa Parks-brand CD's, a viable cause of action also exists under § 43(a) if consumers falsely believed that Rosa Parks had sponsored or approved the song, or was somehow affiliated with the song or the album. We turn then to Defendants' second argument, that even if Parks could establish some likelihood of confusion, the First Amendment protects Defendants' choice of title.

---

[3] A celebrity is defined as "a celebrated or widely known person: one popularly honored for some signal achievement." *Webster's Third New International Dictionary* 359 (Phillip Babcock Gove, ed. 1976).

### 2. *The First Amendment Defense -- Three Approaches*

Defendants allege that even if Parks' evidence demonstrates some likelihood of consumer confusion regarding their song and album, their First Amendment right of artistic expression trumps that concern. Defendants make an arguable point. From ancient times, music has been a means by which people express ideas. As such, music is firmly ensconced within the protections of the First Amendment. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) (stating that paintings, music and poetry are "unquestionably shielded" by the First Amendment); *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."). However, the First Amendment cannot permit anyone who cries "artist" to have *carte blanche* when it comes to naming and advertising his or her works, art though it may be. As the Second Circuit sagely observed, "[t]he purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source [or endorsement] of the product." *Rogers*, 875 F.2d at 997; *see also Cliffs Notes*, *Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 493 (2d Cir. 1989)("Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." (citation omitted)). Courts have adopted three approaches to balance First Amendment interests with the protections of the Lanham Act: (a) the "likelihood of confusion" test; (b) the "alternative avenues" test; and (c) the *Rogers v. Grimaldi* test. We will examine each one in turn.

#### a. *Likelihood of Confusion Factors Used In Commercial Trademark Cases*

One approach is to rely solely on the "likelihood of confusion" factors applied in other, more traditional, trademark cases. That is, we analyze: 1) the strength of the plaintiff's mark; 2) the relatedness of the goods; 3) the similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels used; 6) the likely degree of purchaser

care; 7) the defendant's intent in selecting the mark; and 8) the likelihood of expansion in the product lines of the parties. *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) (adopting the test from *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)); *see also Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (creating a variant of the test). Based upon that evidence, we then decide if the plaintiff has raised a genuine issue of material fact as to the likelihood of consumer confusion. Under this approach, we do not pay special solicitude to an asserted First Amendment defense.

This approach has been inferred from the Ninth Circuit case, *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997). *See Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1078 (C.D. Cal. 1998) ("[I]t appears the Ninth Circuit will not adopt [a] . . . . test balancing trademark protections against the artistic interest in protecting literary titles. . . . *Dr. Seuss* strongly suggests that this 'balancing' has already been adequately accomplished by the statutory framework [of the Lanham Act]."). *But see Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 993 (2003) (distinguishing *Dr. Seuss*). The Tenth Circuit has obliquely endorsed this approach as well. *See Cardtoons*, 95 F.3d at 970 (suggesting the "likelihood of confusion" test "serve[s] to avoid First Amendment concerns" in trademark cases).

### b. Alternative Avenues Test

A second approach is the "alternative avenues" test. This is the test urged upon us by Parks, and endorsed by a panel of the Eighth Circuit. Under the "alternative avenues" test, a title of an expressive work will not be protected from a false advertising claim if there are sufficient alternative means for an artist to convey his or her idea. *See Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402 (8th Cir. 1987) (creator of parody tee-shirts not protected by First Amendment because he could still produce parody editorials in books, magazines,

or film); *Am. Dairy Queen Corp. v. New Line Prods., Inc.*, 35 F. Supp. 2d 727, 734 (D. Minn. 1998) (no First Amendment protection for an infringing movie title because there were other titles the producers could use); *cf. Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 776 (8th Cir. 1994) (First Amendment protection not available to parodist because the confusing trademark use was "wholly unnecessary" to the parodist's stated purpose).

### c. Rogers v. Grimaldi Test

Finally, a third approach is the one developed by the Second Circuit in *Rogers v. Grimaldi* and adopted by the district court in this case. Under *Rogers*, a title will be protected unless it has "no artistic relevance" to the underlying work or, if there is artistic relevance, the title "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. This test was explicitly adopted by the Fifth Circuit in *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664-65 (5th Cir. 2000), and by a panel of the Ninth Circuit in *Mattel*, 296 F.3d at 902. It was also adopted by a district court in the Third Circuit in *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 339 (E.D. Penn. 1996).

### d. Analysis

We conclude that neither the first nor the second approach accords adequate weight to the First Amendment interests in this case. The first approach -- unmodified application of the likelihood of confusion factors in trademark cases –gives no weight to First Amendment concerns. Instead, it treats the name of an artistic work as if it were no different from the name of an ordinary commercial product. However, this approach ignores the fact that the artistic work is *not* simply a commercial product but is also a means of communication. *See Hicks v. Casablanca Records*, 464 F. Supp. 426, 430 (S.D.N.Y. 1978) ("[M]ore so than posters, bubble gum cards, or some other such 'merchandise', books and movies are vehicles through which ideas and opinions are disseminated and, as such, have enjoyed certain constitutional protections,

not generally accorded 'merchandise.'"); *see also Cardtoons*, 95 F.3d at 970 ("The fact that expressive materials are sold neither renders the speech unprotected, nor alters the level of protection under the First Amendment.")(citations omitted). The names artists bestow on their art can be part and parcel of the artistic message. *See Rogers*, 875 F.2d at 998 ("Film-makers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works."). The fact that Defendants use the *Rosa Parks* title in advertising does not automatically erase the expressive function of the title and render it mere commercial exploitation; if a song is sold, and the title is protected by the First Amendment, the title naturally will be "inextricably intertwined" with the song's commercial promotion. *See id.*; *see also Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 796 (1988) (holding that when protected speech is inextricable from unprotected speech, the court will treat the entire message as protected); *Cardtoons*, 95 F.3d at 970.

The public has at least as much interest in the free exchange of ideas as it does in avoiding misleading advertising. If Parks possesses a right to police the use of her name, even when that right can be exercised only to prevent consumer confusion, she has the means to restrict the public discourse to some extent. As Judge Kozinski has pointed out, "Intellectual property rights aren't free: They're imposed at the expense of future creators and of the public at large." *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1516 (9th Cir. 1993) (Kozinski, J., dissenting from denial of rehearing en banc). "Intellectual property . . . includes the words, images, and sounds that we use to communicate, and 'we cannot indulge in the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process.'" *Cardtoons,* 95 F.3d at 971 (*quoting Cohen v. California*, 403 U.S. 15, 26 (1971)). In sum, we do not find the unmodified likelihood of confusion test applied to commercial products adequate to differentiate between those artists who choose titles for the purpose of legitimate artistic relevancy and those artists who choose misleading titles for the purpose of commercial gain. *See*

*Mattel*, 296 F.3d at 900 ("[W]hen a trademark owner asserts a right to control how we express ourselves . . . applying the traditional [likelihood of confusion] test fails to account for the full weight of the public's interest in free expression."). Therefore, we reject the first approach.

The second approach, the "alternative avenues" test, is similarly problematic. The "alternative avenues" test was articulated in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979), and is derived from real property law. The test is premised on the notion that, just as a real property owner may exclude a speaker from a shopping mall so long as other locations exist for the speaker to deliver his message, a celebrity may prohibit use of his or her name so long as alternative ways exist for the artist to communicate his or her idea. *See id.* (*citing Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972)). *See also Mutual of Omaha Ins. Co.*, 836 F.2d at 402 (*citing Dallas Cowboys*, 604 F.2d at 206); *Am. Dairy Queen Corp.*, 35 F. Supp. 2d at 734.

More than one court has noted the awkwardness of analogizing property rights in land to property rights in words or ideas. *See Westchester Media*, 214 F.3d at 672 ("[T]he reasonable alternative avenues approach bears a tenuous relation to communicative and property interests embodied in trademarks."); *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987) ("The first amendment issues involved in this case cannot be disposed of by equating the rights of a trademark owner with the rights of an owner of real property."). Furthermore, the Second Circuit all but retracted its *Dallas Cowboys* decision in *Rogers*. *See* 875 F.2d at 999 n.4 ("We do not read *Dallas Cowboys Cheerleaders* as generally precluding all consideration of First Amendment concerns whenever an allegedly infringing author has 'alternative avenues of communication.'").

To suggest that other words can be used as well to express an author's or composer's message is not a proper test for weighing First Amendment rights. As Mark Twain observed,

"The difference between the almost-right word and the right word is really a large matter -- it's the difference between the 'lightning-bug' and the 'lightning.'" J. Bartlett, *Familiar Quotations* 527 (16th ed.1992); s*ee also New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) ("[W]e need not belabor the point that some words, phrases or symbols better convey their intended meanings than others."). Finally, adopting the "alternative avenues" test would needlessly entangle courts in the process of titling works of art; courts would be asked to determine not just whether a title is reasonably "artistic" but whether a title is "necessary" to communicate the idea. We therefore reject the alternative avenues test.

The third approach, the *Rogers* test, was adopted by the district court in this case and has been endorsed by panels in the Second, Fifth, and Ninth Circuits. Although the *Rogers* test has been criticized, *see, e.g.,* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10:31 (4th ed. 2002), we find it the most appropriate method to balance the public interest in avoiding consumer confusion with the public interest in free expression.

In *Rogers*, the plaintiff was dancer and film star Ginger Rogers. Italian movie maker Federico Fellini made a fictional movie titled *Ginger and Fred* about the reunion of two erstwhile cabaret dancers who became known to their fans as Fred and Ginger because they imitated Fred Astaire and Ginger Rogers in their act. *Rogers*, 875 F.2d at 996-97. Rogers' complaint alleged, *inter alia*, that the title misled viewers into thinking that the movie was about her famous collaboration with Fred Astaire, in violation of the Lanham Act, and that the use of her name infringed her right of publicity. *See id.* at 997. The *Rogers* court, finding that overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values and that the "alternative avenues" test is insufficient to accommodate the public's interest in free expression, adopted a two-pronged test:

In the context of allegedly misleading titles using a celebrity's name, that balance [between avoiding consumer confusion and protecting free expression] will normally not support application of the Act unless [1] the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [2] the title explicitly misleads as to the source or the content of the work.

*Id.* at 999.

Courts in the Second Circuit have routinely applied the *Rogers* test to other Lanham Act cases. *See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993); *Cliffs Notes*, 886 F.2d at 494; *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 51 (E.D.N.Y. 1994); *Girl Scouts of USA v. Bantam Doubleday Dell Publ'g Group, Inc.*, 808 F. Supp. 1112, 1119-20 (S.D.N.Y. 1992). The Fifth Circuit has followed suit. *See Westchester Media*, 214 F.3d at 664.

In addition, a panel of the Ninth Circuit recently adopted the *Rogers* test in *Mattel, Inc. v. MCA Records, Inc.* In *Mattel*, the manufacturer of the well-known "Barbie" doll, sued a Danish band, Aqua, for their song *Barbie Girl*, which, among other things, contained lines that portrayed Barbie in a negative light.[4] Mattel alleged that Aqua's use of the name "Barbie" in the title had confused consumers into believing that Mattel was affiliated with the song. *Mattel*, 296 F.3d at 899. Mattel argued that the song was not about "Barbie" and hence could not be protected by the First Amendment. In the district court, as support, Mattel introduced statements by Aqua band members in interviews that "[t]he song isn't about the doll. We're making fun of the glamourous life." *Mattel,*

---

[4] Among the lines in the song were the following: "I'm a Barbie girl, in my Barbie world/ Life in plastic it's fantastic/ You can brush my hair, undress me everywhere . . . ," and in the chorus, "I'm a blonde bimbo girl, in a fantasy world/ Dress me up, make it tight, I'm your dolly/ . . . Kiss me here, touch me there, hanky-panky . . . ." *Mattel,* 296 F.3d at 909.

*Inc. v. MCA Records*, *Inc.*, 28 F. Supp. 2d 1120, 1138 (C.D. Cal. 1998). Mattel also supplied evidence that purported to show that individuals were misled into believing Mattel and the song were affiliated in some way. Among the evidence was a survey of 556 persons of various ages in six states, 17% of whom believed that Mattel or "Barbie" was the source of, connected with, or gave permission for the *Barbie Girl* song. *Id.* at 1132-33.

On appeal from a summary judgment in favor of the defendant, the Ninth Circuit, applying *Rogers*, concluded that the First Amendment outweighed any risk of confusion between Mattel and the song title. Specifically it found:

Under the first prong of *Rogers*, the use of Barbie in the song title clearly is relevant to the underlying work, namely, the song itself. . . . [T]he song is about Barbie and the values Aqua claims she represents. The song title does not explicitly mislead as to the source of the work; it does not, explicitly or otherwise, suggest that it was produced by Mattel. The *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity.

*Mattel,* 296 F.3d at 902.

The application of *Rogers* in *Mattel*, as well as in cases decided in other circuits, persuades us that *Rogers* is the best test for balancing Defendants' and the public's interest in free expression under the First Amendment against Parks' and the public's interest in enforcement of the Lanham Act. We thus apply the *Rogers* test to the facts before us.

### 3. *Application of the* Rogers *Test*

*a. Artistic Relevance Prong*

The first prong of *Rogers* requires a determination of whether there is any artistic relationship between the title and the underlying work. *Rogers*, 875 F.2d at 999. Parks

contends that a cursory review of the *Rosa Parks* title and the lyrics demonstrates that there is no artistic connection between them. Parks also submits two articles in which members of OutKast are purported to have admitted that the song was not about her. As further evidence, she offers a "translation" of the lyrics of the song *Rosa Parks*, derived from various electronic "dictionaries" of the "rap" vernacular to demonstrate that the song truly has nothing to do with Parks herself. The "translation" of the chorus reads as follows:

"Be quiet and stop the commotion. OutKast is coming back out [with new music] so all other MCs [mic checkers, rappers, Master of Ceremonies] step aside. Do you want to ride and hang out with us? OutKast is the type of group to make the clubs get hyped-up/excited."

Pl. Br. at 5.

Defendants respond that their use of Parks' name is "metaphorical" or "symbolic." They argue that the historical association between Rosa Parks and the phrase "move to the back of the bus" is beyond dispute and that Parks' argument that the song is not "about" her in a biographical sense is simply irrelevant.

The district court was of the opinion that the artistic relationship between the title and the song was "so obvious that the matter is not open to reasonable debate." *Parks*, 76 F. Supp. 2d at 782. The court said:

Rosa Parks is universally known for and commonly associated with her refusal . . . to . . . "move to the back of the bus." The song at issue makes unmistakable reference to that symbolic act a total of ten times. Admittedly, the song is not about plaintiff in a strictly biographical sense, but it need not be. Rather, defendants' use of plaintiff's name, along with the phrase "move to the back of the bus," is metaphorical and symbolic.

*Id.* at 780.

Contrary to the opinion of the district court, we believe that the artistic relationship between the title and the content of the song is certainly not obvious and, indeed, is "open to reasonable debate" for the following reasons.

It is true that the phrase "move to the back of the bus" is repeatedly used in the "hook" or chorus of the song. When the phrase is considered *in the context of the lyrics*, however, the phrase has absolutely nothing to do with Rosa Parks. There could be no stronger, no more compelling, evidence of this fact than the admission of "Dré" (André "Dré" Benjamin) that, "We (OutKast) never intended for the song to be about Rosa Parks or the civil rights movement. It was just symbolic, meaning that we comin' back out, so all you other MCs move to the back of the bus." J.A. at 333.[5] The composers did *not* intend it to be about Rosa Parks, and the lyrics are *not* about Rosa Parks. The lyrics' sole message is that OutKast's competitors are of lesser quality and, therefore, must "move to the back of the bus," or in other words, "take a back seat." We believe that reasonable persons could conclude that there is no relationship of any kind between Rosa Parks' name and the content of the song – a song that is nothing more and nothing less than a paean announcing the triumph of superior people in the entertainment business over inferior people in that business. *Back of the Bus*, for example, would be a title that is obviously relevant to the content of the song, but it also would not have the marketing power of an icon of the civil rights movement.[6] Choosing Rosa Parks'

---

[5] According to the YZ's Unofficial Rap Dictionary, "MC" is "Master of Ceremonies, the mic checker. 'I'm the real emcee, mac daddy.'" J.A. at 493.

[6] Suggesting that "Back of the Bus" would have been an appropriate title is not meant to be an application of the "alternative avenues" test discussed *supra*. It simply shows that such a title would clearly be artistically relevant under the first prong of *Rogers*.

name as the title to the song unquestionably enhanced the song's potential sale to the consuming public.

The *Rogers* court made an important point which clearly applies in this case. The court said, "[p]oetic license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers*, 875 F.2d at 997. The same is also true regarding the content of a song. The purchaser of a song titled *Rosa Parks* has a right not to be misled regarding the content of that song. While the expressive element of titles admittedly requires more protection than the labeling of ordinary commercial products, "[a] misleading title with no artistic relevance cannot be sufficiently justified by a free expression interest," *id.* at 999, and the use of such a title, as in the present case, could be found to constitute a violation of the Lanham Act. Including the phrase "move to the back of the bus" in the lyrics of this song, in our opinion, does not justify, as a matter of law, the appropriation of Rosa Parks' name for the title to the song, and the fact that the phrase is repeated ten times or fifty times does not affect the question of the relevancy of the title to the lyrics.

The district court made the following correct observation:

Plaintiff Rosa Parks is a well-known public figure who has been recognized as an international symbol of freedom, humanity, dignity and strength for over 43 years. Plaintiff's notoriety arose from her heroic stance against racial inequality in the South when on December 1, 1955, in Montgomery, Alabama, she refused to give up her seat to a white passenger and move to the back of the bus. This one defiant act precipitated a 381-day bus boycott that ended segregation on public transportation and ultimately sparked the Civil Rights Movement of the 1960's.

*Parks*, 76 F. Supp. 2d at 777.

While Defendants' lyrics contain profanity and a great deal of "explicit" language (together with a parental warning), they

contain absolutely nothing that could conceivably, by any stretch of the imagination, be considered, explicitly or implicitly, a reference to courage, to sacrifice, to the civil rights movement or to any other quality with which Rosa Parks is identified. If the requirement of "relevance" is to have any meaning at all, it would not be unreasonable to conclude that the title *Rosa Parks* is *not* relevant to the content of the song in question. The use of this woman's name unquestionably was a good marketing tool – *Rosa Parks* was likely to sell far more recordings than *Back of the Bus* – but its use could be found by a reasonable finder of fact to be a flagrant deception on the public regarding the actual content of this song and the creation of an impression that Rosa Parks, who had approved the use of her name in connection with the *Tribute* album, had also approved or sponsored the use of her name on Defendants' composition.

It is certainly not dispositive that, in response to an interview following the filing of this lawsuit, one of the OutKast members said that using Rosa Parks' name was "symbolic." Where an artist proclaims that a celebrity's name is used merely as a "symbol" for the lyrics of a song, and such use is highly questionable when the lyrics are examined, a legitimate question is presented as to whether the artist's claim is sincere or merely a guise to escape liability. Our task, it seems to us, is not to accept without question whatever purpose Defendants may now claim they had in using Rosa Parks' name. It is, instead, to make a determination as to whether, applying the law of *Rogers*, there is a genuine issue of material fact regarding the question of whether the title is artistically relevant to the content of the song. As noted above, crying "artist" does not confer *carte blanche* authority to appropriate a celebrity's name. Furthermore, crying "symbol" does not change that proposition and confer authority to use a celebrity's name when none, in fact, may exist.

It appears that the district court's rendition of summary judgment for OutKast was based on the court's conclusion that Defendants' use of Plaintiff's name as the song's title

was "metaphorical and symbolic." *Id.* at 780. The obvious question, however, is *symbolic of what*? There is no doubt that Rosa Parks is a symbol. As the parties agree, she is "an international symbol of freedom, humanity, dignity and strength." J.A. at 79. There is not even a hint, however, of any of these qualities in the song to which Defendants attached her name. In lyrics that are laced with profanity and in a "hook" or chorus that is pure egomania, many reasonable people could find that this is a song that is clearly *antithetical* to the qualities identified with Rosa Parks. Furthermore, the use of Rosa Parks' name in a metaphorical sense is highly questionable. A metaphor is "a figure of speech in which a word or phrase denoting one kind of object or action is used in place of another to suggest a likeness or analogy between them." *Webster's Third New International Dictionary* 1420 (Phillip Babcock Gove, ed. 1976). The use of the phrase "go to the back of the bus" may be metaphorical to the extent that it refers to OutKast's competitors being pushed aside by OutKast's return and being forced to "take a back seat." The song, however, is not titled *Back of the Bus*. It is titled *Rosa Parks*, and it is difficult to equate OutKast's feeling of superiority, metaphorically or in any other manner, to the qualities for which Rosa Parks is known around the world. We believe that reasonable people could find that the use of Rosa Parks' name as the title to this song was not justified as being metaphorical or symbolic of anything for which Rosa Parks is famous. To the contrary, reasonable people could find that the name was appropriated solely because of the vastly increased marketing power of a product bearing the name of a national heroine of the civil rights movement.

We do not mean to imply that Rosa Parks must always be displayed in a flattering manner, or that she should have the ability to prevent any other characterization of her. She is a celebrity and, as such, she cannot prevent being portrayed in a manner that may not be pleasing to her. As the court noted in *Guglielmi v. Spelling-Goldberg Productions*, 603 P.2d 454, 460 (Cal. 1979) (Bird J., concurring), "[t]he right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire." It has been held, for

example, that, "[p]arodies of celebrities are an especially valuable means of expression because of the role celebrities play in modern society." *Cardtoons*, 95 F.3d at 972. The present case, however, does not involve any claim of caricature, parody or satire. It involves, instead, the use of a celebrity's name as the title to a song when it reasonably could be found that the celebrity's name has no artistic relevance to the content of the song. It involves, in short, a reasonable dispute whether the use of Rosa Parks' name was a misrepresentation and false advertising or whether it was a legitimate use of a celebrity's name in some recognized form of artistic expression protected by the First Amendment.

In *Rogers*, the court, in discussing the title to the movie *Ginger and Fred*, observed that "there is no doubt a risk that some people looking at the title 'Ginger and Fred' might think the film was about Rogers and Astaire in a direct, biographical sense. For those gaining that impression, the title is misleading." 875 F.2d at 1001. Likewise, in the present case, some people looking at the title *Rosa Parks* might think the song is about Rosa Parks and for those gaining that impression (as twenty-one consumer affidavits filed in this case indicate happened, J.A. at 342-62), the title is misleading.[7] This, standing alone, may not be sufficient to show a violation of the Lanham Act *if* the title is nevertheless artistically relevant to the content of the underlying work.

There is a clear distinction, however, between the facts in *Rogers* and the facts in the present case. In *Rogers*, the court had no difficulty in finding that the title chosen for the movie

---

[7]Typical of the affidavits filed in this case is that of Curt Merrweth:
1. I purchased the Outkast album, Aquemini, with Rosa Parks' song advertised on the outside label.
2. I thought the lyrics were about the civil rights movement and Mrs. Rosa Parks' historic contributions.
3. I learned after purchasing the album and listening to the content of the song that Mrs. Parks' name was used to get my attention so that I would buy the album.

J.A. at 343.

*Ginger and Fred* had artistic relevance to the content of the movie. "The central characters in the film are nicknamed 'Ginger' and 'Fred,' and these names are not arbitrarily chosen just to exploit the publicity value of their real life counterparts but instead have genuine relevance to the film's story." 875 F.2d at 1001. The *Rogers* court further pointed out that the title *Ginger and Fred* is "entirely truthful as to its content in referring to the film's fictional protagonists who are known to their Italian audience as 'Ginger and Fred.'" *Id.* In other words, the title in *Rogers* was obviously relevant and truthful as to the film's content, because the film was about the main characters known in the film as Ginger and Fred. In contrast, it cannot be said that the title in the present case, *Rosa Parks*, is clearly truthful as to the content of the song which, as OutKast admits, is not about Rosa Parks at all and was never intended to be about Rosa Parks, and which does not refer to Rosa Parks or to the qualities for which she is known.

Furthermore, the contrast between the real Ginger and Fred and the fictional Ginger and Fred in the film served the director's purpose of satirizing contemporary television and, in that sense, the title was "an integral element of the film and the film maker's artistic expressions." *Id.* OutKast's only explanation for the use of Rosa Parks' name in the title of their song, however, is that the name Rosa Parks is "a symbol." It is, indeed, a symbol, but the question presented is how the symbol of Rosa Parks, a symbol of "freedom, humanity, dignity, and strength," is artistically related to the content of a song that appears to be diametrically opposed to those qualities. The song is not claimed to be a satire, a parody or some other form of artistic expression that would be protected under the broad umbrella of the First Amendment. The mere fact that the phrase "move to the back of the bus" is an apt description of OutKast's attitude toward entertainers they regard as lesser human beings is not, in our view, a justification, as a matter of law, for appropriating the name of Rosa Parks.

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) involved facts that are remarkably different from the facts of this case. In applying the first prong of *Rogers*, the Ninth Circuit in *Mattel* stated:

> We expect a title to describe the underlying work, not to identify the producer, and Barbie Girl does just that.

> The Barbie Girl title presages a song about Barbie, or at least a girl like Barbie. The title conveys a message to consumers about what they can expect to discover in the song itself; it's a quick glimpse of Aqua's take on their own song. The lyrics confirm this: The female singer, who calls herself Barbie, is "a Barbie girl, in [her] Barbie world." She tells her male counterpart (named Ken), "Life in plastic, it's fantastic. You can brush my hair, undress me everywhere/Imagination, life is your creation." And off they go to "party." The song pokes fun at Barbie and the values that Aqua contends she represents.

. . . .

> *Under the first prong of* Rogers*, the use of Barbie in the song title clearly is relevant to the underlying work, namely, the song itself. As noted, the song is about Barbie and the values Aqua claims she represents.*

*Id.* at 901-902 (emphasis added).

In sharp contrast to *Mattel*, it is highly questionable that the facts in the present case satisfy the first prong of *Rogers*. Whereas the title *Barbie Girl* was clearly relevant to the lyrics of the song, ("the song is about Barbie and the values Aqua claims she represents"), it cannot be said that the title *Rosa Parks* is clearly relevant to the lyrics of the song in this case. While the lyrics of *Barbie Girl* are certainly not flattering to the wholesome image preferred by the creator of Barbie ("the song pokes fun at Barbie and the values that Aqua contends she represents"), parody is an artistic form of expression protected by the First Amendment. In contrast, there has been

no attempt to defend *Rosa Parks* on the ground that it constitutes a parody of Rosa Parks or a satire of Rosa Parks or some other form of artistic expression involving Rosa Parks herself.

The *Mattel* case, therefore, in our view, is completely distinguishable from the facts of the present case. If anything, we believe its application of *Rogers* and the result of that application to the title and lyrics of *Barbie Girl* could support a conclusion that the title *Rosa Parks* has no artistic relevance to the lyrics of Defendants' song. The result would be that Defendants cannot satisfy even the first prong of *Rogers* in order to justify their appropriation of Rosa Parks' name.

A case that is more similar to the present case than *Mattel* is *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996). In *Seale*, defendants produced and distributed a movie entitled "Panther," which was a combination of fiction and historical fact involving Bobby Seale and the Black Panther Party, founded by Seale and Huey P. Newton in 1966. Seale, Newton and another leader of the Black Panther Party, Eldridge Cleaver, were all portrayed in the movie by actors. Similar to the stipulation in the present case, it was undisputed that the plaintiff was "a well-known public and historical figure" and that, "[t]he Plaintiff's name and his role in the Black Panther Party may be found in most history books discussing the Civil Rights Movement of the 1960's." *Id.* at 335.

In addition to the movie, various defendants in the case produced: (1) a book titled *Panther: A Pictorial History of the Black Panthers and the Story Behind the Film*; (2) a videotape of the movie; and (3) a CD/cassette containing a collection of the songs from the movie. The promotional cover for the home video release of the movie mentioned Seale's name and had a photograph of the actors who portrayed Seale, Newton and Cleaver in the movie. The cover of the musical CD/cassette contained the same photograph that was on the home video, together with another photograph of a scene from the movie. Seale, who had never consented

to the use of his name for the movie, the book, the videotape or the CD/cassette, brought suit alleging violations of § 43(a) of the Lanham Act and his common-law right of publicity. The defendants moved for summary judgment on all claims.

The *Seale* court found that defendants were entitled to summary judgment on plaintiff's common-law right of publicity claim as it concerned the movie, the pictorial history book, and the videotape. The court had no trouble finding that the creation of a movie and history book that integrated fictitious people and events with historical people and events surrounding the emergence of the Black Panther Party in the late 1960's was protected by the First Amendment. The court also found that the "use of the Plaintiff's name and likeness on the cover of the pictorial history book and on the cover for the home video are *clearly related to the content of the book and the film*, the subject matter of which deals with the Black Panther Party and the Plaintiff's role as co-founder of the Party." *Id.* at 337 (emphasis added).

The use of the plaintiff's name and likeness on the cover of the musical CD/cassette, however, was an entirely different matter. The music contained on the CD/cassette consisted of various songs composed by different musicians. The court pointed out:

> Clearly, the use of the Plaintiff's name and likeness on the cover of the musical CD/cassette does not relate to the content in the CD/cassette in the same manner as the use of the Plaintiff's name and likeness on the cover of the home video and pictorial history book relates to the content of the film and pictorial history book--the subject matter of which concerns the Black Panther Party and the Plaintiff's role as co-founder of the Party. The film and pictorial history book tell the story of the Black Panther Party and the Plaintiff's role in that Party in the late 1960's; *the musical CD/cassette is merely a collection of different songs performed by different musicians, which songs have no direct connection to the Plaintiff or the history of the Black Panther Party.* There is a genuine

> issue of material fact, therefore, whether the use of the Plaintiff's name and likeness on the cover of the musical CD/cassette is clearly related to the content of the film "Panther" and serves as an advertisement for the film, or whether the Defendants' use of the Plaintiff's name and likeness on the cover of the CD/cassette is a disguised advertisement for the sale of the CD/cassette. *See Rogers v. Grimaldi*, 875 F.2d 994, 1004-05 (2d Cir.1989).

*Id.* at 337-38 (emphasis added).[8]

The court made the same findings in virtually the same language regarding Seale's claim under Section 43(a) of the Lanham Act, again applying *Rogers* and reaching the same result, *i.e.*, that a genuine issue of material fact was presented. *Id.* at 340. The court, therefore, denied defendants' motion for summary judgment on both the plaintiff's common law right of publicity claim and Lanham Act claim as those claims related to the defendants' use of Bobby Seale's name and likeness on the CD/cassette.[9]

---

[8] In addition to *Rogers*, the *Seale* court also referred to Section 46 of the *Restatement (Third) of Unfair Competition*, published in 1995. That section is titled "Appropriation of the Commercial Value of a Person's Identity: The Right of Publicity." It provides, "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for the purposes of trade is subject to liability . . ."

The court further noted that, although Section 47 of the *Restatement (Third) of Unfair Competition* states that use "for purposes of trade" does not ordinarily include "the use of a person's identity in news reporting, commentary, entertainment, works of fiction or non-fiction, or in advertising that is incidental to such uses," comment c to that section states that "if the name or likeness is used solely to attract attention to a work that is not related to the identified person, the user may be subject to liability for a use of the other's identity in advertising." *See Seale*, 949 F. Supp. at 336.

[9] The court in the *Seale* case, following a bench trial on the merits, found that the plaintiff had failed to present sufficient evidence to support his claims and entered judgment in favor of defendants. *See Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d

We reach the same conclusion in the present case. There is a genuine issue of material fact whether the use of Rosa Parks' name as a title to the song and on the cover of the album is artistically related to the content of the song or whether the use of the name Rosa Parks is nothing more than a misleading advertisement for the sale of the song.

### b. Misleading Prong

In *Rogers*, the court held that if the title of the work is artistically relevant to its content, there is no violation of the Lanham Act *unless* the "title explicitly misleads as to the source or the content of the work." 875 F.2d at 999. The court noted with reference to the first prong of the *Rogers* analysis:

> A misleading title with no artistic relevance cannot be sufficiently justified by a free expression interest. For example, if a film-maker placed the title "Ginger and Fred" on a film to which it had no artistic relevance at all, the arguably misleading suggestions as to source or content implicitly conveyed by the title could be found to violate the Lanham Act as to such a film.

*Id.*

In discussing the second prong of its analysis, in the context of using a celebrity's name in the title of some artistic work, the court explained:

> [T]itles with at least minimal artistic relevance to the work may include explicit statements about the content of the work that are seriously misleading. For example, if the characters in the film in this case had published their memoirs under the title "The True Life Story of Ginger and Fred," and if the film-maker had then used

---

1225 (3d Cir. 1998). The significance of *Seale* in the context of the present case, however, is that the question of liability was not determined on a motion for summary judgment but was left for a trial on the merits.

> that fictitious book title as the title of the film, the Lanham Act could be applicable to such an explicitly misleading description of content. But many titles with a celebrity's name make no explicit statement that the work is about that person in any direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work. As to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act. . . . Where a title with at least some artistic relevance to the work is not explicitly misleading as to the content of the work, it is not false advertising under the Lanham Act.

*Id.* at 1000 (footnote omitted).

We considered all the facts presented to us and concluded that, with reference to the first prong of the *Rogers* analysis, the issue of artistic relevance of the title *Rosa Parks* to the lyrics of the song is highly questionable and cannot be resolved as a matter of law. However, if, on remand, a trier of fact, after a full evidentiary hearing, concludes that the title *is* used in some symbolic or metaphorical sense, application of the *Rogers* analysis, under the particular facts of this case, would appear to be complete. In the present case, the title *Rosa Parks* "make[s] no explicit statement that the work is about that person in any direct sense." In other words, Defendants did not name the song, for example, *The True Life Story of Rosa Parks* or *Rosa Parks' Favorite Rap.*

In short, whether the title *Rosa Parks* has any artistic relevance to the content of the song is an issue that must be resolved by a finder of fact following an evidentiary hearing and not by a judge as a matter of law upon the limited record submitted in support of a motion for summary judgment. If, on remand, the finder of fact determines that OutKast placed the title *Rosa Parks* on a song to which it had no artistic relevance at all, then this would constitute a violation of the Lanham Act and judgment should be entered in favor of Plaintiff. However, if the finder of fact determines that the title is artistically relevant to the song's content, then the

inquiry is at an end because the title "is not explicitly misleading as to the content of the work." In that event, judgment should be entered in favor of Defendants.

## C. Right of Publicity

### 1. *Applicable Law*

The right of publicity protects the identity of a celebrity from exploitive commercial use. *See Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 835 (6th Cir. 1983). "The theory of the right is that a celebrity's identity can be valuable in the promotion of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity." *Id.* As such, the common law right of publicity forms a species of property right. *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 325 (6th Cir. 2001); *Cardtoons*, 95 F.3d at 967.

The right of publicity is governed by state law. *See Landham*, 227 F.3d at 622. Michigan has indicated that it would recognize a right of publicity, s*ee Pallas v. Crowley, Milner & Co.*, 33 N.W.2d 911, 914 (Mich. 1948), and the parties have not questioned that Plaintiff has a right of publicity. The dispute is over its application to the facts of this case.

Parks' right of publicity argument tracks that of her Lanham Act claim. She alleges that Defendants have profited from her fame by using her name solely for a commercial purpose. She supplies much the same evidence in support of her right of publicity claim as she did for her Lanham Act claim: the lyrics of *Rosa Parks*, the "translation," and the press clippings quoting OutKast members. Defendants do not deny that they have used the title *Rosa Parks* commercially, but argue that Parks has produced no evidence that their use was *solely* commercial. Instead, they argue that the choice was also artistic, and that they therefore have a complete defense in the First Amendment.

The district court agreed with Defendants. The district court applied *Rogers*, which, in addition to the false advertising claim under § 43(a), also dealt with a right of publicity action arising under Oregon state law. Under *Rogers,* with respect to a right of publicity claim, a title that uses a celebrity's name will be protected by the First Amendment unless the title is "wholly unrelated" to the content of the work or was "simply a disguised commercial advertisement for the sale of goods or services." *Rogers*, 875 F.2d at 1004. The district court found that, as a matter of law, there was an artistic relationship between the title and the content of the song, and therefore it could not be considered "simply a disguised commercial advertisement." *Parks*, 76 F. Supp. 2d at 781. Defendants' use of the title to promote the album did not change this result. *Id.*

### 2. *Analysis*

A right of publicity claim is similar to a false advertising claim in that it grants a celebrity the right to protect an economic interest in his or her name. *See Carson*, 698 F.2d at 835 ("The right of publicity has developed to protect the commercial interest of celebrities in their identities."). However, a right of publicity claim does differ from a false advertising claim in one crucial respect; a right of publicity claim does not require any evidence that a consumer is likely to be confused. *See Herman Miller*, 270 F.3d at 319-20 (*citing Restatement (Third) of Unfair Competition* § 46 cmt. c (1995)); *Rogers*, 875 F.2d at 1004; *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1030 (C.D. Cal. 1998). All that a plaintiff must prove in a right of publicity action is that she has a pecuniary interest in her identity, and that her identity has been commercially exploited by a defendant. *See Landham*, 227 F.3d at 624; *Carson*, 698 F.2d at 835.

The parties have stipulated that Parks is famous and that she has used her name to promote other goods and services. She has therefore established an economic interest in her name. *See Landham*, 227 F.3d at 624. Furthermore, Defendants admit that they have used Parks' name as the

name of their song, and have used that name to sell the song and their album. They argue, however, that, as with the Lanham Act claim, their First Amendment right of artistic expression should prevail over Parks' claim.

### a. Cognizability of a First Amendment Defense

Because a plaintiff bears a reduced burden of persuasion to succeed in a right of publicity action, courts and commentators have recognized that publicity rights carry a greater danger of impinging on First Amendment rights than do rights associated with false advertising claims. *See Rogers*, 875 F.2d at 1004; *see also Cardtoons*, 95 F.3d at 967 (noting that publicity rights offer "substantially broader protection" than laws preventing false endorsement); *cf.* Roberta Rosenthal Kwall, *The Right of Publicity vs. The First Amendment: A Property and Liability Rule Analysis*, 70 Ind. L. J. 47 (1994).

We have recognized the importance of a First Amendment defense to right of publicity actions in a recent case. In *Ruffin-Steinback v. dePasse*, friends and family members of the Motown group, the "Temptations," sued the makers of a televised mini-series for the manner in which they and the former group members were portrayed in the film. 82 F. Supp. 2d 723, 726-27 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir. 2001). The plaintiffs alleged that their likenesses were appropriated to endorse a product, the film, without their permission. *Id.* at 728. The court found in that case that the plaintiffs could not overcome the defendant's First Amendment defense, even where the portrayal of the plaintiffs was partly fictionalized, and even where the likenesses of the plaintiffs were used to promote a videocassette version of the mini-series. *Id.* at 730-31; *see also Seale*, 949 F. Supp. at 337 (holding that the film *Panther*, which used the name and likeness of Black Panther founder Bobby Seale, was protected by the First Amendment).

As with the Lanham Act, then, we must conduct another balancing of interests -- Parks' property right in her own name versus the freedom of artistic expression. *See ETW Corp. v.*

*Jireh Publ'g, Inc.*, 99 F. Supp. 2d 829, 834-36 (N.D. Ohio 2000); *Pooley v. Nat'l Hole-in-One Ass'n*, 89 F. Supp. 2d 1108, 1113-14 (D. Ariz. 2000); *dePasse*, 82 F. Supp. 2d at 731.

### b. Application of a First Amendment Defense

In *Rogers*, the Second Circuit held that movie titles are protected from right of publicity actions unless the title is "wholly unrelated" to the content of the work or was "simply a disguised commercial advertisement for the sale of goods or services." 875 F.2d at 1004. This test is supported in the context of other expressive works by comment c of § 47 of the *Restatement (Third) of Unfair Competition*. It states that "[u]se of another's identity in a novel, play, or motion picture is . . . not ordinarily an infringement [of the right of publicity, unless] the name or likeness is used solely to attract attention to a work that is not related to the identified person." The *Rogers* formulation is also supported by the decision in *dePasse*. In *dePasse,* the court cited *Seale*, 949 F. Supp. at 337, for the proposition that the relationship between a plaintiff's identity and the content of the work is an element of a defense to a right of publicity action. *See dePasse*, 82 F. Supp. 2d at 731. *Seale*, in turn, relied upon *Rogers*. *See* 949 F. Supp. at 337; *see also Rogers*, 875 F.2d at 1004-05. We thus apply *Rogers* to the instant case.

For the same reasons we have stated earlier and need not repeat, we believe that Parks' right of publicity claim presents a genuine issue of material fact regarding the question of whether the title to the song is or is not "wholly unrelated" to the content of the song. A reasonable finder of fact, in our opinion, upon consideration of all the evidence, could find the title to be a "disguised commercial advertisement" or adopted "solely to attract attention" to the work. *See Rogers*, 875 F.2d at 1004-05.

### D. Other Michigan State Law Claims

Parks also appeals the district court's decision to grant summary judgment to Defendants on her state law claims for

defamation and intentional interference with a business relationship. Finding no merit in either of these claims, we treat them briefly below.

### 1. Defamation

Parks argues that the song defames her character or places her in a false light. To succeed on a defamation claim, a public figure must prove actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). In turn, actual malice requires a showing, by clear and convincing evidence, that a defendant made a false statement with knowledge of the falsity or with reckless disregard for the truth. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 773 (1986). A statement is actionable only if it states actual facts about plaintiff that are "provable and false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16-17, 19-20 (1990). The song is plainly not about Parks in any biographical sense of the term, and certainly does not make any factual statements about her. As there is no factual statement about her, Parks cannot show even the first element of a defamation claim. Therefore, we find this argument meritless.

Parks' defamation-by-implication argument is likewise meritless. As with a traditional defamation claim, a plaintiff in a defamation-by-implication claim must establish a material falsity. *See Hawkins v. Mercy Health Serv., Inc.*, 583 N.W.2d 725, 731-32 (Mich. Ct. App. 1998). Parks has not done so. The mere fact that Parks' name is attached to something "offensive" is not enough to overcome Defendants' First Amendment rights. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (applying the public figure defamation test to deny celebrity's intentional infliction of emotional distress claim against defendant's magazine for its depiction of him engaged in incest and alcohol abuse). We therefore agree that Defendants deserved summary judgment on this claim.

### 2. *Intentional Interference with Business Relationship*

Parks also claims that Defendants intentionally interfered with her business relationship with the producers of the *Tribute* album. To make a successful claim for tortious interference with a business relationship in Michigan, Parks must show an "intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading . . . contractual rights or business relationship[s]." *Chrysler Int'l Corp. v. Cherokee Exp. Co.*, 134 F.3d 738, 745 (6th Cir. 1998) (citation and internal quotation marks omitted)(applying Michigan law). This "wrongful act" must have hastened a contract breach or another breakdown of a business relationship. *See Lakeshore Cmty. Hosp., Inc., v. Perry*, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995). No such breach or breakdown occurred in this case. Parks cites dicta from *Stormor v. Johnson*, 587 F. Supp. 275 (W.D. Mich. 1984), which suggests that Michigan might recognize a claim if a defendant's action made the plaintiff's business relationship more expensive or burdensome. Ignoring for the moment that Michigan has not clearly recognized a tort claim on such grounds, Parks has not brought forth evidence that Defendants' song *Rosa Parks* makes the production or promotion of the *Tribute* album more expensive or burdensome. Consequently, this claim must fail.

### III. CONCLUSION

We are not called upon in this case to judge the quality of Defendants' song, and whether we personally regard it as repulsive trash or a work of genius is immaterial to a determination of the legal issues presented to us.[10] Justice Holmes, 100 years ago, correctly observed that, "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious

---

[10]"What is food to one, is to others bitter poison." Lucretius, 99-55 B.C., John Bartlett, *Familiar Quotations*, 16th ed., p. 90.

limits." *George Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903). The same is no less true today and applies with equal force to musical compositions. The point, however, is that while we, as judges, do not presume to determine the artistic quality of the song in question, we have the responsibility, as judges, to apply a legal standard of "artistic relevance" in resolving the rights of Rosa Parks concerning the use of her name and the First Amendment rights of the Defendants in the creation and marketing of a musical composition.[11] Application of that standard involves a recognition that Rosa Parks has no right to control her image by censoring disagreeable portrayals. It also involves a recognition that the First Amendment cannot permit anyone who cries "artist" to have *carte blanche* when it comes to naming and advertising his works.

In this case, for the reasons set forth above, the fact that Defendants cry "artist" and "symbol" as reasons for appropriating Rosa Parks' name for a song title does not absolve them from potential liability for, in the words of Shakespeare, filching Rosa Parks' good name.[12] The question of that liability, however, should be determined by the trier of fact after a full evidentiary hearing and not as a matter of law on a motion for summary judgment.

---

[11] *Cf. Miller v. California*, 413 U.S. 15 (1973), in which the Supreme Court, acknowledging "the inherent dangers of undertaking to regulate any form of expression," nevertheless adopted a legal standard regarding obscenity and the First Amendment which required the trier of fact to consider, *inter alia*, whether the work, taken as a whole, lacks "serious literary, artistic, political, or scientific value." *Id.* at 23-24.

[12]

Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.

William Shakespeare, *Othello,* act 3, sc. 3.

For the reasons stated, as to Rosa Parks' Lanham Act claim and her common law right of publicity claim, the judgment of the District Court is **REVERSED** and this case is **REMANDED** for future proceedings not inconsistent with this Opinion. With respect to Rosa Parks' claims of defamation and tortious interference with a business relationship, the judgment of the District Court is **AFFIRMED**.